## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

)
UNITED STATES OF AMERICA  )
                          )
v.                        )          Criminal No. 05-CR40035-FDS
                          )
RICHARD BOTCHWAY          )
_____)

### DEFENDANT'S PRELIMINARY MEMORANDUM
### IN SUPPORT OF MOTION TO SUPPRESS EVIDENCE SEIZED IN SEARCH
### OF AUTOMOBILE AND RESULTING STATEMENTS

Defendant Botchway has moved to suppress all evidence seized from the

automobile in which he was a passenger, as well as all "fruit of the poisonous tree,"

including his statements. Information now available demonstrates violations of

defendant's rights under the Fourth Amendment. The court should hold an evidentiary

hearing concerning the circumstances surrounding the search of the vehicle and allow the

defendant's motion.

### FACTUAL BACKGROUND

On July 13, 2005 State Trooper William Pinkes stopped a car being driven by

Scott Wilson as it was exiting the Massachusetts Turnpike in Auburn. There were two

passengers in the car, defendant Botchway and Sanusi Mohammed. All three men are

black. Aside from these most basic facts, most of the circumstances surrounding the

subsequent search of the car are in dispute. The defendant believes that even if the court

accepts as credible the version of events reported by Trooper Pinkes in his incident

report, suppression is warranted. If, on the other hand, the court accepts the defendant's

version of events, then the impropriety of the search and seizure is even more manifest.

### A. Trooper Pinkes' Version of Events

The following version of events is based upon Trooper Pinkes' incident report, provided as Attachment A hereto.

At 9:30 p.m. Trooper Pinkes saw a Mitsubishi sedan with a Connecticut plate exiting the Turnpike with "a defective tail lamp . . . the left rear brake lamp was stuck on." He signaled the car to pull over on the exit ramp. The driver, Scott Wilson, produced a license, but no registration. Trooper Pinkes asked Wilson to step out of the car to show him the broken light and ask further questions. Wilson was extremely nervous, stammering, repeating Trooper Pinkes' questions and looking around. He stated that they were coming from Connecticut, where they had been visiting the girlfriend of one of the passengers. As Trooper Pinkes was speaking to Wilson, he saw Botchway, the front seat passenger, lean out of the car and vomit.

Trooper Pinkes then questioned Botchway. Botchway produced an expired New Jersey identification card. He stated that they were traveling from Delaware, going to Leicester, MA, that they had stopped in the Bronx to visit a friend, but he could not identify this friend.

Trooper Pinkes then turned his attention to the rear seat passenger, Sanusi Mohammed. He appeared nervous and evasive. He stated that the car belonged to his girlfriend, Sophia. He said that he and Wilson had driven to Delaware to pick up Botchway, and that they were taking Botchway to Leicester where he would be staying with friends for one week to one month. Trooper Pinkes asked about the absence of clothes in the car and Mohammed responded that Botchway had clothes at the friends'

2

house in Leicester. Further questioning of Botchway established that he did not have clothes in the car.

Trooper Pinkes then asked Mohammed for consent to search the car. Mohammed responded, "I have no problem. Look all you want."

Trooper Pinkes then opened and searched the trunk. He found two computers, a flatbed scanner, a monitor, an ID printer and a briefcase. He opened the briefcase and found papers and effects indicating that the briefcase belonged to Botchway. He asked Botchway if the briefcase belonged to him and Botchway said it did. There is nothing in the report about Botchway consenting to a search of his briefcase. Trooper Pinkes searched the contents of the briefcase and found numerous credit cards in Botchway's name, numerous checkbooks in the names of third parties, numerous credit card applications in the names of third parties, a stack of blank ID cards, a number of fake ID cards and licenses from various states with various third party names. These ID cards looked similar to the blank cards also found in the briefcase. Trooper Pinkes then questioned Botchway about the contents of the briefcase.

Botchway told Trooper Pinkes that he used the blank cards to make work IDs for people. He admitted making the drivers licenses. Responding to questioning, he told Trooper Pinkes that he used the computer and printer in the trunk to make the IDs. He made additional incriminating statements about the materials in his briefcase.

In his report, Trooper Pinkes states that"[b]ased upon Botchway's statements," he seized all the related evidence he found in the trunk, including an Eltron ID printer, a Dell computer, a Vega computer, a Quantum hard drive, an HP flatbed scanner, and the briefcase containing all of the cards and other materials.

3

No one was arrested at the scene. The car was not impounded. The three men were permitted to drive away.

The next day, by prearrangement, Botchway came to the State Police barracks in Holden to pick up his computer. Special Agent Patrick Cummings of the Immigration and Customs Enforcement Agency questioned Botchway. Botchway admitted that the seized licenses and computer equipment belonged to him and that he supplied the licenses to individuals to assist them in getting employment. All of the seized evidence was transferred to SA Cummings.

Forensic examination conducted by the Department of Homeland Security concluded that drivers licenses found in Botchway's briefcase were counterfeit. The seized Quantum hard drive was found to contain numerous images of Pennsylvania licenses, social security cards, photographs and signatures. More generally, the bulk of the materials seized from Botchway's briefcase, the computers, the scanner and the ID card printer all are inculpatory, particularly given Botchway's statements admitting that he used the equipment to make phony IDs.

B. Defendant's Version of Events

As detailed in his affidavit, provided as Attachment B hereto, defendant Botchway disputes numerous assertions made in Trooper Pinkes incident report.

The owner of the car, Sophia Adu, lent the car to her boyfriend Scott Wilson. During the trip and after the stop, Botchway had numerous opportunities to look at the rear of the car. He did not see anything wrong with a taillight.

On July 10, 2005 the car was issued an automated violation in New York for failure to stop before entering a crosswalk. The citation was based upon automated

4

photographs. A copy of the citation notice is provided at Attachment C hereto. While the photographs are not good quality, if a tail light had been stuck on it likely would be visible. It is not.

Ms. Adu purchased the car from New Britain Auto Sales on approximately May 23, 2005. The car, of necessity, was inspected at that time and there was nothing wrong with any tail light. Copies of the purchase documents are provided at Attachment D.

Mr. Botchway asserts in his affidavit that Trooper Pinkes ordered all three men to get out of the car and sit on the ground. He asserts that neither Sanusi Mohammed nor Scott Wilson consented to a search of the car and that Trooper Pinkes never asked for consent. Mr. Botchway also states that he did not vomit and did not consent to the search of his briefcase. He states that all statements he made concerning the creation of ID cards and the electronic equipment found in the trunk occurred after Trooper Pinkes confronted him and questioned him regarding materials found in his briefcase.

## ARGUMENT

## I. EVEN IF TROOPER PINKES' VERSION OF EVENTS WAS TRUE, THE SEARCH WAS ILLEGAL AND ALL EVIDENCE SEIZED AND STATEMENTS MADE MUST BE SUPPRESSED

Assuming the facts alleged by Trooper Pinkes to be true, they bear great similarity to those in United States v. Infante-Ruiz, 13 F. 3d 498 (1st Cir. 1994).

In Infante-Ruiz the defendant was a passenger in a rented car with two others. Police, with an outstanding arrest warrant for Infante-Ruiz on federal drug charges, stopped the car and placed Infante-Ruiz in a nearby squad car. An officer asked the driver for consent to search the car. The driver consented and the officer searched the interior. The officer then asked the driver for the key to the trunk. Although the officer

5

did not ask for consent to search the trunk, the driver gave him the key and didn't object as the trunk was searched.

In the trunk the officer found an unlocked briefcase and asked the driver who owned it. The driver replied that it belonged to Infante-Ruiz. The officer did not ask the driver or Infante-Ruiz for consent to open the briefcase. He searched through the contents of the briefcase and found a loaded gun. For reasons that apply directly to this case, the First Circuit held that the search of the briefcase was unlawful.

A. Botchway's Privacy Interest in the Briefcase

The First Circuit concluded that Infante-Ruiz had a privacy interest in his briefcase even though he had permitted others, including the driver, to place possessions of theirs in it. Id. at 501-502. The facts establishing Botchway's privacy interest in his briefcase are even clearer. There is no evidence that Botchway allowed others to put things in his briefcase. He "did not repudiate his privacy interest in the briefcase by placing it in the trunk . . ." Id. at 502.

B. No Reasonable Suspicion to Justify Interrogation and Search

In Infante-Ruiz the police, knowing the defendant was a fugitive on federal drug trafficking charges, had reason to interrogate him. The permissible scope of an initial inquiry conducted by a police officer is based upon the nature of the stop. Commonwealth v. Bartlett, 41 Mass. App. Ct. 468, 470 (1996). Where a stop is based upon a traffic offense, "if the driver produces a valid license and registration, there is ordinarily no reason for an officer to probe further." Id. at 471.

When stopped by Trooper Pinkes, Scott Wilson produced a license but no registration. While G.L. c. 90, § 11 provides that a driver shall have ready access to the

6

vehicle's registration, the failure to do so is not a criminal offense and the statute imposes no penalty. Trooper Pinkes issued a civil infraction to Wilson for defective equipment. He did not issue a citation for driving without registration. See, Citation, Attachment E hereto. Trooper Pinkes could have quickly established that the car was registered to Ms. Adu through a computer or radio check. Instead, according to Botchway, Trooper Pinkes ordered all of the men out of the car. He interrogated them about their travels and searched the car. Whether the result of a hunch, or racial profiling, or both, Trooper Pinkes' conduct was not justified by a broken taillight and a missing registration. The suspicious factors referenced in Trooper Pinkes' report - - the alleged nervousness of the men and Botchway's vomiting - - did not justify the subsequent interrogation.

Nor did the information provided by the men warrant further interrogation or investigation. Their explanation of where they had been was consistent. Wilson stated that they had come from Connecticut (the car had Connecticut plates) and had driven to the home of a passenger's girlfriend. Botchway said that he had been picked up in Delaware and was going to Leicester. Mohammed said that he'd gone with Wilson from Connecticut to Delaware to pick up Botchway and they were going to drop Botchway off in Leicester. These explanations provided no reasonable basis to suspect that the men were involved in criminal conduct or were transporting contraband.

C. No Probable Cause to Search the Trunk or the Briefcase

In Infante-Ruiz the police knew that the defendant was a federal fugitive on drug trafficking charges and that the other occupants were under suspicion for drug trafficking. They also knew that the defendant and the others all had "serious drug trafficking records." Id. The Court held that there was no probable cause for the search of the trunk

7

or the briefcase. "[I]t was not enough here that the suspected vehicle contained persons with serious drug trafficking records. There had to be particular facts indicating that at the time of the search, the vehicle or a container within it carried contraband, evidence of crime, or other seizable matter." Id.

As in Infante-Ruiz, Trooper Pinkes, "had no concrete information that [Botchway] and his friends were transporting drugs or weapons [or any other contraband] at the time of the stop." Id. In fact, Trooper Pinkes had far less reason to suspect that there was contraband in the trunk or briefcase than the police in Infante-Ruiz.

Even if the court accepted Trooper Pinkes' version of events, the only facts he had to go on were that the car had a broken tail light, all three men appeared nervous, Botchway vomited, the driver had no registration, Botchway had an expired ID card, and the men's stated travel itinerary struck Trooper Pinkes as suspicious because Botchway had no suitcase or clothing in the car. These alleged facts provide no probable cause to believe that there was contraband in the trunk or in Botchway's briefcase.

In Commonwealth v. Santos, 65 Mass. App. Ct. 122 (2005), the Appeals Court, applying Fourth Amendment based caselaw, examined the permissible scope of a search where the defendant, after being stopped for a traffic violation, was unable to produce a license or registration. The court held that a trooper's ordering of the defendant to exit the car and search of vehicle could not be justified as a Terry stop and search. The court noted that the trooper's suspicions regarding the identity or the ownership of the car could have been quickly resolved "through routine computer or radio checks." Id. at 126. "If the trooper thought the use of the car unauthorized, the obvious investigatory step

8

would be the routine one of checking to see if the car had been reported stolen." Id.
(quoting Bartlett, 41 Mass. App. Ct. at 471).

An officer's "actions must be no more no more intrusive than necessary at each
step to effectuate both the safe conclusion to the traffic stop and the further investigation
of the suspicious conduct." Santos at 126-127 (quoting Commonwealth v. Torres, 433
Mass 669, 675 (2001).

As in Santos, the search conducted by Trooper Pinkes was not for a protective
purpose, it was investigatory. Trooper Pinkes was not searching for weapons when he
opened the trunk or the briefcase, and none of the occupants were in a position to reach
into the trunk and grab a weapon. The investigatory search conducted by Trooper Pinkes
cannot be justified by Scott Wilson's failure to produce a registration and the various
suspicious conduct allegedly observed by Trooper Pinkes. See, Santos, supra;
Commonwealth v. Pacheco, 51 Mass. App. Ct. 736, 742 (2001) (rejecting uncertainty of
identification as justification for general exploratory search of car); Commonwealth v.
Kimball, 37 Mass. App. Ct. 604, 608 (1994) (officer not allowed "to rummage" through
car to continue to "play his hunch" that car was stolen); Terry v. Ohio, 392 U.S. 1, 29
(1968) (search must be "confined in scope to an intrusion reasonably designed to
discover. . . [weapons] for the assault of the police officer").

There was no arrest at the scene; even if there had been an arrest, it would not
have justified a search of the trunk. In Thornton v. United States, 541 U.S. 615 (2004),
the Court held that the arrest of an automobile occupant permitted a contemporaneous
search of the passenger compartment even where the defendant had been removed from
the car, handcuffed and placed in a police vehicle. The Court found such a search was

9

justified to insure the safety of the police and to preserve evidence. The Court suggested that an arrestee could somehow manage to get back into the passenger compartment of his car to grab a weapon or destroy evidence. Id. at 621. As extraordinary as this rationale is,[1] it stops short of suggesting that the police may go beyond the passenger compartment and search the trunk. Even if one of the occupants of the car had been arrested by Trooper Pinkes, the search incident to arrest could not have gone beyond the passenger compartment. Id. at 623.

D. Discovery was not Inevitable

In Infante-Ruiz the Court rejected the Government's argument that the gun inevitably would have been discovered in the course of an inventory search as there was no basis to conclude that the police could have lawfully taken custody of the car if they had not found the gun. Id. at 503-504. Nor was there evidence of standardized inventory procedures concerning closed containers found in a trunk.

The determination that discovery of the items found by Trooper Pinkes in the trunk was not inevitable is far simpler. The vehicle was not seized. There was no inventory search. Botchway and his friends drove away from the scene.

E. No Consent to Search the Trunk or the Briefcase

In Infante-Ruiz the First Circuit did not determine whether the police had consent to search the trunk. Instead, the court focused on the briefcase. The Court suggests that consent for the search of the trunk could be inferred from the driver's handing the key to the trunk to the police and failing to object to the search. The search of the trunk in

---

[1] In a concurrence, Justice Scalia rejects the majority's reasoning as being premised upon a "mythical arrestee possessed of the skill of Houdini and the strength of Hercules." Id. at 625-26 (Scalia, J., concurring) (quoting United States v. Frick, 490 F.2d 666, 673 (5th Cir. 1973) (opinion concurring in part and dissenting in part).

10

Botchway's case is more problematic. Trooper Pinkes' report does not suggest that he asked for or received permission to search the trunk. His assertion that Mohammed said, "Look all you want," does not permit the inference that he was consenting to a search of the trunk. Unlike Infante-Ruiz, there is no contention that Mohammed did anything to affirmatively accede to a search of the trunk. Moreover, Botchway's assertion that Mohammed did not consent to a search is supported by the fact that the car did not belong to Mohammed's girlfriend, as reported by Trooper Pinkes. The car belonged to Scott Wilson's girlfriend. Trooper Pinkes' fabrication of consent is strongly suggested by the fact that he has the driver and passenger confused. Mohammed could not have consented to a search of a car that was not lent to him to begin with. He was merely a backseat passenger in a car that had been lent to the driver, Scott Wilson.

As to the briefcase, the facts in this case are far simpler that in Infante-Ruiz and clearly establish that there was no consent to open the briefcase.

In Infante-Ruiz there was evidence that the driver's property was co-mingled in the defendant's briefcase. Consequently, the Court found that if the driver had elected to give consent to open the briefcase, he had authority to do so. Instead, he told the police that the briefcase belonged to Infante-Ruiz. The Court held that the driver's general consent to a search did not extend to searching a container in the trunk. Id. at 504-505.

In the instant case the facts do not present such complexities. Trooper Pinkes did not ask who the briefcase belonged to before opening it. He never obtained consent from the driver, Scott Wilson, the individual the car was lent to. Sanusi Mohammed had no authority to consent to the search of anything. According to Trooper Pinkes' report, as soon as he opened the briefcase and before he found anything suspicious, he came across

papers indicating that the briefcase belonged to Botchway. Botchway was asked to confirm that the briefcase was his. There is nothing in the report to suggest that Botchway consented to a search of his briefcase and he denies doing so.

### F. Everything Found in the Trunk and All Statements Must be Suppressed

Prior to Trooper Pinkes' search of the briefcase, there was no evidence whatsoever that Botchway had done anything illegal. Even if it is assumed that the discovery of the computer equipment, ID printer and scanner in the trunk was permissible, there was no evidence linking these items to any illegality. The mere possession of an ID printer is not a crime. 18 U.S.C. § 1028 (a) (5) criminalizes the possession of a document-making implement only where the defendant intends to use the implement in the production of false documents.

The discovery of the inculpatory nature of the materials found in the trunk flowed from the search of Botchway's briefcase. The search of the briefcase resulted in the discovery of credit cards, ID cards and other inculpatory materials. This discovery led to Trooper Pinkes' questioning of Botchway and Botchway's admission that he had made phony ID cards using the computer and printer in the trunk. Therefore, all evidence found in the trunk and the briefcase and all inculpatory statements made by Botchway after Trooper Pinkes opened the briefcase, including all statements he made the next day to Special Agent Patrick Cummings, must be suppressed as "fruit of the poisonous tree." See, Wong Sun v. United States, 371 U.S. 471, 487-488 (1963).

## II. TROOPER PINKES LACKED REASONABLE SUSPICION TO STOP THE CAR AND ALL EVIDENCE OBTAINED AS A RESULT OF THE UNLAWFUL STOP MUST BE SUPPRESSED

To justify a stop, the police officer must have a reasonable suspicion supported by articulable facts that the person has committed, or is about to commit, a crime. Terry v. Ohio, 392 U.S. 1, 30 (1988). In the context of a stop for a civil motor vehicle violation, the officer must have "probable cause" to believe that the traffic violation has occurred. Whren v. United States, 517 U.S. 806, 810 (1996).

In finding facts on this motion, the court must base its finding on the preponderance of the credible evidence. See, e.g., United States v. Davis, 2000 WL 1873966 at *1 (D. Conn. Nov. 30, 2000) (citing United States v. Matlock, 415 U. S. 167, 177, n. 14 (1974); United States v. Heatley, 32 F. Supp. 2d 131, 132-133 (S.D.N.Y. 1998); see also, State v. Terzado, 513 So. 2d 741 (Fla. Dist. Ct. App. 1987) (where officer alleged a broken taillight, "trial court considered the credibility of the witnesses and resolved conflicts in the evidence before determining that no traffic violation had occurred.").

Based on the preponderance of the credible evidence to be presented to the court, the court should find that there was nothing wrong with the taillight of the car driven by Scott Wilson. Consequently, Trooper Pinkes did not have a reasonable articulable suspicion to believe that a crime had been, or was about to be, committed.

Where the initial stop by police was unlawful, and the evidence obtained by the police was the immediate and direct result of that illegality, the Government is not entitled to introduce into evidence the fruit of the unlawful act. United States v. Leon, 468 U.S. 897 (1984); Costello v. United States, 365 U.S. 265, 280 (1961).

13

### III. RACIAL PROFILING IN VIOLATION OF THE EQUAL PROTECTION CLAUSE REQUIRES SUPPRESSION OF EVIDENCE

In Commonwealth v. Lora, 16 Mass. L. Rptr. 715, 2003 WL 22350945 (Mass. Super.), Judge McCann of the Superior Court allowed a motion to suppress a kilogram of cocaine found in the trunk of a car searched by Trooper Pinkes and his line mate. Judge McCann found that the stop and search were consistent with racial profiling that violated the defendant's rights under the Equal Protection Clause of the Fourteenth Amendment.

In support of his motion to suppress, the defendant in Lora submitted data and a statistical analysis of vehicle stops conducted by Pinkes from June 16, 2001- August 3, 2001 and conducted by his line mate from August 22, 2001- February 18, 2002.

In evaluating the statistics presented regarding Trooper Pinkes, the court found:

a)    Trooper Pinkes conducted non-inventory searches in 42% of the stops of African-American operators and 2% of the stops of Caucasions;

b)    An African- American operator was 36.6 times more likely to be searched by Trooper Pinkes than a Caucasian;

c)    With respect to searches conducted in Auburn, Pinkes had a minority search rate of 69.67% and a Caucasian search rate of 1.58%, resulting in a disparity of 37.7%, 28 times greater than the State Police's minority search rate.

Judge McCann noted that an Equal Protection violation may be shown "by using statistics to demonstrate a significant disparity." Id. (citing United States v. Armstrong, 517 U.S. 456, 467 (1996) and Chavez v. Illinois State Police, 251 F. 3d 612, 637 (7th Cir. 2001)); see also, Flowers v. Fiore, 239 F.Supp. 173, 178 (D.R.I. 2003). Judge McCann

14

found that the statistics presented by the defendant demonstrated a prima facie showing
of discrimination that went unrebutted by the Commonwealth.

Racial profiling also may be inferred where the Court disbelieves a police
officer's testimony regarding the occurrence of the traffic violation on which the stop was
predicated. See, State v. Maryland, 167 N.J. 471, 487-489 (2001).

Defendant Botchway intends to establish that there was no broken taillight. In
evaluating this contention and weighing the credibility of Trooper Pinkes, the court must
consider why Trooper Pinkes stopped the car. Evidence of racial profiling, therefore, is
relevant to the issue of whether there was a basis for a stop. In addition, even if the court
accepts Trooper Pinkes' assertion that a taillight was broken, the issue of racial profiling
is relevant to the question of whether a broken taillight was used as a pretext for a stop
and search. See Maryland, supra, (suppression of evidence on Fourteenth Amendment
grounds warranted based on selective enforcement of traffic laws).

## CONCLUSION

For the foregoing reasons, the court should grant defendant Botchway's Motion to
Suppress.

Richard Botchway
By his Attorney,

Keith Halpern, BBO# 545282
4 Longfellow Place, 37th Floor
Boston, MA 02114
(617) 694-9974

Certificate of Service
I hereby certify that I have this date served the above by causing a true copy thereof to be mailed by first
class postage prepaid mail to all counsel of record.
Dated: 3/14/06                                    Keith Halpern

15



 
| | | |
|---|---|---|
| **Incident #: 2005-0C6-1255** | | **Incident Report** |
| **Date:** Thursday, 14 July, 2005 | | **Crime Against Public Order** |
| **Time:** 0005HRS | | **Worcester DC** |

Investigating Officer: Trooper Pinkes, William M 2255 @ C-6      Involves 209 Abuse? NO
Incident Location:      AUBURN: 290@ RAMP - RT 90 TO RT 395 NB:

| | |
|---|---|
| **OTCHWAY, Richard A** | **Passenger: OSCH189903873** |
| 30 NORTH KATRIN CIRCLE MANOR, DE 19720 | Phone # (302) 328-5918 |

| | | | | | |
|---|---|---|---|---|---|
| SN: 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 | DOB: 08/16/1963 | Age: 41 | Sex: Male | Race: | Black Non-Hispanic |
| Height: 5ft 07in | Weight: 190 lbs | Hair: Black | Eyes: Brown | Build: | Heavy |
| Born: AFGHANISTAN | | Marital Status: | | Complexion: | Dark |
| Father: | | Mother: | | Spouse: | |

**License Information:**

| | | | |
|---|---|---|---|
| Operator State & #: | Class: | Status: | Exp: |
| Susp/Rev: | Reason: | | |

**Offenses:**

**Alias:**          **Peculiarities:**

**Vehicle Information:**

| | |
|---|---|
| Owner: ADU, Sophia A | 625 BURRITT ST. APT#201B NEW BRITAIN, CT |
| CT 450TVJ | Year: 2001    Make/Model: MITSUBISHI GALANT |
| VIN: 4A3AA46G11E030705 | Type: Sedan    Color: BLACK |
| ss: ——·——·Exp: | Rev/Susp:    Reason: |
| Stolen: No | Evidence: Yes    Inventory: No |
| Status: | TowCo: |

**Incident Particulars:**

| Victim | Value | Type |
|---|---|---|
| | | |

---

**Incident Gist:**

7/14/05 2005-0C6-1255

1.    ON 07-13-05 AT APPROX. 2130 HOURS I WAS ON PATROL MONITORING TRAFFIC EXITING THE MASSACHUSETTS TURNPIKE ONTO THE RAMP FOR ROUTES 290/395 IN THE TOWN OF AUBURN. I OBSERVED A MITSUBISHI SEDAN PASS BY ME WITH A CT REG ATTACHED THAT HAD A DEFECTIVE TAIL LAMP. THE LEFT REAR BRAKE LAMP WAS STUCK ON. I SIGNALED THE MV TO STOP AND IT DID SO ON THE RAMP SYSTEM.

2.    I APPROACHED THE M.V. BEARING CT REG #450-TVJ ON THE PASSENGER SIDE. AS I WALKED UP THE RIGHT SIDE I OBSERVED A BLACK MALE LYING ACROSS THE REAR SEAT FEIGNING SLEEP. NO ONE IN THE M.V. WAS WEARING A SEATBELT. I ASKED THE OPERATOR FOR HIS LICENSE AND REGISTRATION TO THE M.V. HE PRODUCED A MA LICENSE IDENTIFYING HIM AS SCOTT A. WILSON, 03-22-66, MA LIC #S98235004 BUT WAS UNABLE TO PRODUCE A REGISTRATION TO THE M.V. AT THIS POINT I ASKED THE OPERATOR TO STEP TO THE REAR TO SHOW THE VIOLATION TO

| Investigating Officer | State Police Holden | Reviewed By |
|---|---|---|
| *[signature]* | 612 Main Street, Route 122A | |
| Pinkes, William M | Holden, MA 01520 | |

Printed: 7/14/05    10:15:42PM      1      Supervisor Status: NOT-SUBMITTED

 
| | |
|---|---|
| **Incident #:** 2005-0C6-1255 | **Incident Report** |
| **Date:** Thursday, 14 July, 2005 | **Crime Against Public Order** |
| **Time:** 0005HRS | **Worcester DC** |

Investigating Officer: Trooper Pinkes, William M 2255 @ C-6          Involves 209 Abuse?   NO
Incident Location:     AUBURN: 290@ RAMP - RT 90 TO RT 395 NB:

HIM AND MAKE FURTHER INQUIRIES RELATIVE TO THE OWNERSHIP OF THE M.V.

3.    AT THE REAR WILSON BECAME EXTREMELY NERVOUS, HE WAS STAMMERING WHEN ASKED SIMPLE QUESTIONS, CONTINUALLY REPEATED QUESTIONS BACK AND WAS CONSTANTLY LOOKING AROUND WHEN ANSWERING QUESTIONS. WILSON STATED THAT THEY WERE COMING FROM VISITING THE PASSENGERS GIRLFRIEND IN CT. WHILE CONVERSING WITH WILSON I OBSERVED THE FRONT PASSENGER OPEN THE DOOR, LEAN OUT AND VOMIT. WILSON WAS RETURNED TO THE M.V.

4.    I ASKED THE FRONT PASSENGER FOR ID AND HE PRODUCED AN EXPIRED NJ IDENTIFICATION CARD IDENTIFYING HIM AS RICK BOTHEWAY. WHEN ASKED BOTCHEWAY STATED THAT THEY WERE GOING TO LEICESTER AND COMING FROM DELAWARE. BOTCHEWAY ALSO STATED THEY HAD STOPPED IN THE BRONX, N.Y. ON THE WAY UP TO VISIT A FRIEND BUT HE WAS UNABLE TO TELL ME A NAME, ADDRESS OR PHONE NUMBER OF THIS FRIEND.

5.    INQUIRIES OF THE REAR SEAT PASSENGER WERE MADE. HE WAS IDENTIFIED AS SANUSI MOHAMMED, 03-06-75, SS#018868007 VIA A MASSACHUSETTS LICENSE. MOHAMMED WAS ALSO VERY NERVOUS AND EVASIVE WHEN ANSWERING QUESTIONS. MOHAMMED TOLD ME THAT THE M.V. BELONGED TO HIS GIRLFRIEND SOPHIA. MOHAMMED TOLD ME THAT HE HAD GONE WITH WILSON TO DELAWARE TO PICK UP BOTCHWAY 2 DAYS AGO AND THAT BOTCHWAY WOULD BE STAYING WITH FRIENDS IN LEICESTER FOR ONE WEEK TO ONE MONTHS TIME. WHEN ASKED ABOUT THE ABSENCE OF CLOTHING IN THE M.V. MOHAMMED JUST STARED AT ME THEN TOLD ME THAT BOTCHWAY HAD CLOTHES AT HIS HOUSE IN LEICESTER.

6.    TPR. KEENEY AND TPR. WLADKOWSKI ARRIVED AT THIS TIME. FURTHER INQUIRIES OF BOTCHWAY REVEALED HE DID NOT HAVE CLOTHES IN THE CAR OR AT MOHAMMED'S APT. FOR HIS STAY. I SPOKE WITH MOHAMMED AT THIS TIME AND REQUESTED CONSENT TO SEARCH THE M.V. WHICH HE GRANTED WAVING AT THE CAR STATING "I HAVE NO PROBLEM, LOOK ALL YOU WANT."

7.    A SEARCH OF THE M.V. LED TO THE TRUNK. IN THE TRUNK I LOCATED TWO COMPUTERS, A FLATBED SCANNER, A MONITOR, AN ID PRINTER AND A SOFTSIDE BRIEFCASE. WHILE LOOKING IN THE BRIEFCASE I CAME ACROSS NUMEROUS PAPERS AND EFFECTS INDICATING THE BRIEFCASE WAS THE PROPERTY OF BOTCHWAY. I CALLED BOTCHWAY OVER AND INQUIRED IF THE BRIEFCASE WAS HIS. HE STATED IT WAS. WHILE LOOKING INSIDE THE BRIEFCASE I LOCATED NUMEROUS CREDIT CARDS NOT IN BOTCHWAYS' NAME. NUMEROUS CHECKBOOKS IN 3RD PARTY NAMES WERE LOCATED AS WERE NUMEROUS CREDIT APPLICATIONS IN THE NAMES OF 3RD PARTIES. I LOCATED A STACK OF BLANK ID CARDS WITH A MAGNETIZED STRIP ON THE BACK. SUBSEQUENT TO THIS I LOCATED A NUMBER OF FAKE IDENTIFICATION CARDS AND

| Investigating Officer | State Police Holden | Reviewed By |
|---|---|---|
| _signature_  Pinkes, William M | 612 Main Street, Route 122A<br>Holden, MA 01520 | |



Incident #: 2005-OC6-1255                                                     Incident Report
Date:      Thursday, 14 July, 2005                                Crime Against Public Order
Time:      0005HRS                                                            Worcester DC

Investigating Officer: Trooper Pinkes, William M 2255 @ C-6          Involves 209 Abuse?  NO
Incident Location:    AUBURN: 290@ RAMP - RT 90 TO RT 395 NB:

LICENSES FROM VARIOUS STATES WITH NUMEROUS 3RD PARTY NAMES AND BIOGRAPHICAL
DATA ATTACHED TO SAME. THESE CARDS/LICENSES MATCHED THE EARLIER LOCATED STACK
OF BLANK CARDS.

8.    AS I BEGAN LOCATING THIS TYPE OF EVIDENCE BOTCHWAY TOLD ME THAT HE USED THE
BLANKS TO MAKE WORK ID'S FOR PEOPLE. WHEN PRESENTED WITH THE LICENSES' FROM
VARIED STATES BOTCHWAY TOLD ME THAT HE HAD MADE THESE BUT THAT HE WAS ONLY
FOOLING AROUND. I ASKED BOTHCHWAY HOW HE MADE THEM AND HE TOLD ME THAT HE USED
THE COMPUTER IN THE TRUNK AND PRINTED THEM ON THE LOCATED PRINTER. RELATIVE TO
THE CREDIT CARDS BOTCHWAY TOLD ME THAT HE HAD SIMPLY FOUND ALL OF THEM ON THE
GROUND AT VARIOUS TIMES. BOTCHWAY FURTHER TOLD ME THAT MANY OF THE PAPERS IN
THE BRIEFCASE WERE NOT HIS AND THAT WHEN HE RENTED HIS BUSINESS PROPERTY THEY
WERE IN THE OFFICE AND HE HAD BEEN MEANING TO GET RID OF THEM. I POINTED OUT TO
BOTCHWAY THAT MANY OF THESE PAPERS HAD HIS NAME/E-MAIL/PHONE NUMBERS ON THEM.
BOTCHWAY RESPONDED "I DON'T KNOW." I LOCATED A NUMBER OF SHEETS OF BLANK CHECKS,
BOTCHWAY TOLD ME HE PRINTED HIS OWN CHECKS. WHEN SHOWN CHECKS PRINTED ON THE
SAME PAPER IN A 3RD PARTY NAME BOTCHWAY TOLD ME HE KNEW NOTHING ABOUT THESE.
BOTCHWAY ADMITTED TO USING THE ALIAS OF RICHARD MARSHALL BUT WAS UNABLE TO
EXPLAIN WHY.

9.    BASED UPON BOTCHWAYS' STATEMENTS OF PRODUCING FRAUDULENT LICENSE AND ID
CARDS UTILIZING THE LOCATED COMPUTER EQUIPMENT I SEIZED ALL THE RELATED EVIDENCE
TO CONDUCT A FURTHER INVESTIGATION. SEIZED FROM THE SCENE AS EVIDENCE WERE THE
FOLLOWING: (1)ELTRON P310 PRINTER SN-E28040, (2)DELL OPTIPLEX COMPUTER SN-06QP3,
(3)VEGA COMPUTER MODEL #3080 SN-AMDK650020003510, (4)QUANTUM HARD DRIVE
SN-388903223353YYZXX, (5)HEWLETT PACKARD FLATBED SCANNER SN-SG68F210WZ, (6)SOFTSIDE
NYLON BREIFCASE CONTAINING AFOREMENTIONED ITEMS. ALL PARTIES WERE RELEASED FROM
THE SCENE PENDING FURTHER INVESTIGATION. EVIDENCE WAS RETURNED TO SP-HOLDEN
WHERE IT WAS LOGGED AND SECURED PENDING FURTHER INVESTIGATION.

10.   ON 07-14-05 I MET WITH MEMBERS OF THE MASSACHUSETTS JOINT TERRORISM TASK FORCE
AND NATIONAL SECURITY GROUP. SSA PATRICK CUMMINGS, DEPT. OF HOMELAND SECURITY,
IMMIGRATION & CUSTOMS ENFORCEMENT WAS PRESENT AT THIS MEETING. BOTCHWAY CAME
TO SP-HOLDEN A SHORT TIME LATER TO PICK UP HIS COMPUTERS. HE ARRIVED DURING THE
MEETING AND PURSUANT TO THIS MEETING IT WAS DETERMINED THAT BOTCHWAY WAS IN
VIOALTION OF INS LAWS AND HE WAS ADVISED BY SSA CUMMINGS THAT HE WOULD BE
TRANSPORTED TO BOSTON ON THE INS VIOLATION. BOTCHWAY WAS TAKEN INTO CUSTODY AND
TRANSPORTED TO BOSTON BY MYSELF AND TPR. SEAN BARRY, #3071. UPON ARRIVAL AT
BOSTON CUSTODY WAS TRANSFERRED TO SSA CUMMINGS. ALL EVIDENCE WAS ALSO
TRANSFERRED TO THE CUSTODY OF SSA CUMMINGS PENDING A FRAUD INVESTIGATION.

| Investigating Officer | State Police Holden | Reviewed By |
|---|---|---|
| Pinkes, William M | 612 Main Street, Route 122A Holden, MA 01520 | |

Printed:  7/14/05    10:15:42PM                    3                    Supervisor Status:  NOT-SUBMITTED



UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA
v.
RICHARD BOTCHWAY

Criminal No.
05-CR40035-FDS

AFFIDAVIT OF RICHARD BOTCHWAY
IN SUPPORT OF MOTION TO SUPPRESS

I, Richard Botchway, attest:

1. I am the defendant in this action.

2. On July 13, 2005 I was picked up in Delaware by Scott Wilson, who was driving a Mitsubishi sedan owned by his girlfriend, Sophia Adu. Mr. Wilson was accompanied by Sanusi Mohammed.

3. I was a front seat passenger when the car driven by Scott Wilson was stopped by a State Trooper at about 9:30 p.m. as we exited the Mass Pike in Auburn. A police car came up behind us with a siren and flashing lights. There was one Trooper in the car. I later learned

that the name of the Trooper was
William Pinkes.

4. Prior and subsequent to the time that
Trooper Pinkes stopped the car I had a
number of opportunities to look at the
rear of the car. I did not observe
anything wrong with a tail light. I did
not see a tail light stuck on.

5. Trooper Pinkes walked over to our car.
He asked Mr. Wilson for his license and
registration. Either Mr. Wilson or Mr.
Mohammed asked him why he had pulled us
over when we had just paid the toll
and were not speeding. Trooper Pinkes
replied, "Shut the fuck up."

6. I said to Trooper Pinkes, "You haven't
even told us why you stopped us." He
did not respond.

7. Trooper Pinkes told all of us to get
out of the car and sit on the ground.
We did so. Trooper Pinkes then began
looking in the car. He opened the
trunk and searched it. He called me

to come over to him.

8. When I approached Trooper Pinkes I saw him holding open my briefcase that had been in the trunk. He began pulling materials out of the briefcase and asked me about them.

9. No one consented to a search of the car. Trooper Pinkes never asked anyone for consent to search the car.

10. No one consented to a search of my briefcase. Trooper Pinkes never asked me or anyone else for consent to search the briefcase.

11. I did not vomit after the car was pulled over.

12. All statements I made to Trooper Pinkes about making licenses and ID cards, about the contents of my briefcase, and about the electronic equipment in the trunk, were made after Trooper Pinkes searched through my briefcase, without my consent, in response to

questions of Trooper Pinkes concerning
the materials he found in my briefcase.


Signed under the penalties of perjury
this 13th day of March, 2006



Richard Botchway
Richard Botchway





**NEW YORK CITY**
**DEPARTMENT OF FINANCE**
RED LIGHT CAMERA MONITORING PROGRAM

POST OFFICE BOX 3674, CHURCH STREET STATION, NEW YORK, NEW YORK 10008–3674



# NOTICE OF LIABILITY

Aug. 03, 2005

**THE CITY OF NEW YORK**

VS.

SOPHIA A. ADU
625 BURRITT ST APT 201B
NEW BRITAIN, CT 06053–2853

**Please take notice** as the Registrant of the vehicle described below which was operated in violation of section 1111 (d) of the Vehicle and Traffic Law at the place, date and time below: because **the driver did not stop for the red light** at the stop line, or before entering the crosswalk, **you are liable to pay a fine within 30 days of the date of this notice (NOL) for the amount shown** herein pursuant to section 1111 (a) of the VTL, section 19–210 of the NYC Administrative Code and the Rules of the NYC Department of Finance. One or more photographs evidencing the violation are shown. Please see the reverse for further instructions.

| AMOUNT DUE: $ 50.00 | NOL #:5011052825 |
| --- | --- |

**VIOLATION DATE/TIME:** 07/10/2005 06:50 PM

**LOCATION:** NYC Manhattan 145th St.(E)@St. Nicholas Ave.–Md–12







18:50:30 07/10/05 M-D R 0.80 004A L1



18:50:31 07/10/05 M-D R 1.95 004B L1

Detach here and return bottom portion with payment

## PAYMENT COUPON

* Make your check or money order payable to the NYC Department of Finance
* **DO NOT MAIL CASH**
* Write on the front of your payment:
  1) the 10 digit Notice(s) of Liability Number(s)
  2) your Plate Number(s)
  3) your State(s) of Registration
  4) your Plate Type(s)
* Insert this tear off coupon in the enclosed envelope.

NYC DEPARTMENT OF FINANCE
RED LIGHT CAMERA MONITORING PROGRAM
P.O. BOX 3674
CHURCH STREET STATION
NEW YORK, NEW YORK 10008–3674



| PLATE | STATE | | TYPE |
| --- | --- | --- | --- |
| 450TVJ | CT | | |

| NOL NUMBER | | VERSION | AMOUNT DUE |
| --- | --- | --- | --- |
| 5011052825 | | V 1.0 | $    50.00 |

NOLRL



**FINANCE**
**NEW · YORK**
THE CITY OF NEW YORK
DEPARTMENT OF FINANCE

**Red Light Violation**
**Monitoring Program**

---

# Red Light Fact Sheet

Legislation has been enacted to allow the city of New York to issue Notices Of Liability for red light violations based on images taken by an automated camera. The red light cameras are installed to deter motorists from committing red light violations. The enforcement of these violations has been given to the Department of Transportation.

The enclosed images were taken automatically by such a camera. The Red Light Camera is connected to a traffic light and is only active when the light is red, not when the light is green or yellow.

Vehicles crossing the stop line or entering the crosswalk after the light turns red are detected automatically. The camera takes two photographs, approximately one second apart. The images show the date and exact time of the violation as well as the number of seconds since the light had turned red. (Refer to Data Field explanation, below). A flash unit allows the camera to operate at night as well as in daylight.

When a red light offense is photographed, the registrant is mailed a Notice of Liability along with one or more images showing the violation. The registrant is Liable for a fine, currently of $50.00, but will not receive points on his or her driver's license.

Under the law, the registrant can be held liable even if he or she was not the driver if the car was photographed going through the red light.

The enclosed Notice of Liability describes the procedures for paying the fine or pleading not guilty and requesting a hearing. Please read all of the information carefully.

| SAMPLE | Explanation of Red Light Photo Data Field | | | | SAMPLE |
|--------|--------|--------|--------|--------|--------|
| 19:26:01 | 06/09/01 | Q-C | R 00.33 | 999A | L4 |
| ⇑ | ⇑ | ⇑ | ⇑ | ⇑ | ⇑ |
| **Time of Violation** | **Date of Violation** | **Location Code** | **Time Since Signal Turned To Red (in seconds)** | **Serial Frame Number** | **Lane Number** |



or the Total Sale Price. The Total Sale Price is the total price of the Vehicle and any services you buy, plus the over time. The Total Sale Price agreed to purchase the items over time. The Total Sale Price

5. When permitted by law, we may sue you for additional amounts if the proceeds of a sale do not pay all of the amounts you owe us.

| RETAIL INSTALMENT CONTRACT AND SECURITY AGREEMENT  No. Date 05-23-2005 | Seller  New Britain Auto Sales 246 Beaver Str. New Britain, CT 06051  "We" and "us" mean the Seller above, its successors and assigns. | Buyer  Sophia Adu 625 Burritt Str. New Britain, CT 06053  "You" and "your" mean each Buyer above, and guarantor, jointly and individually. |
|---|---|---|

**SALE:** You agree to purchase from us, on a time basis, subject to the terms and conditions of this contract and security agreement (Contract), the Motor Vehicle (Vehicle) and services described below. The Vehicle is sold in its present condition, together with the usual accessories and attachments.

| Description of Motor Vehicle Purchased | Year 2001 Make Mitsu Model Galant | VIN 4A3AA46G11E030705    Other: Lic. No./Year ☐ New ☒ Used |
|---|---|---|

| Description of Trade-In |
|---|

**SECURITY:** To secure your payment and performance under the terms of this Contract, you give us a security interest in the Vehicle, all accessions, attachments, accessories, and equipment placed in or on the Vehicle, together called Property, and proceeds of the Property. You also assign to us and give us a security interest in proceeds and premium refunds of any insurance and service contracts purchased with this Contract.

**PROMISE TO PAY AND PAYMENT TERMS:** You promise to pay us the amount of $ 8572.18 . This is a precomputed contract. This means that the amount you have agreed to pay includes finance charges payable from today's date until the last scheduled payment is due. Finance charges are calculated on a ____365____ day basis. After maturity, or after you default and we demand payment, we will earn finance charges on the unpaid balance at ____19____ % per year. You agree to pay this Contract according to the payment schedule and late charge provisions shown in the TRUTH IN LENDING DISCLOSURES. You also agree to pay any additional amounts according to the terms and conditions of this Contract.

**DOWN PAYMENT:** You also agree to pay, or apply to the Cash Price, on or before today's date, any cash, rebate and net trade-in value described in the ITEMIZATION OF AMOUNT FINANCED. ☐ You agree to make deferred payments as part of the cash down payment as reflected in your Payment Schedule.

### TRUTH IN LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | AMOUNT FINANCED The amount of credit provided to you or on your behalf. | TOTAL OF PAYMENTS The amount you will have paid when you have made all scheduled payments. | TOTAL SALE PRICE The total cost of your purchase on credit, including your down payment of |
|---|---|---|---|---|
| 19 % | $ 1559.54 | $ 7012.64 | $ 8572.18 | $ 2000.00 $ 10,572.18 |

**Payment Schedule:** Your payment schedule will be

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 113 | $75.86 | weekly beginning 06-10-2005 |

**Security:** You are giving a security interest in the Motor Vehicle purchased.

☒ **Late Charge:** If a payment is more than ____10____ days late, you will be charged 5% up to $10.00

**Prepayment:** If you pay off this Contract early, you may be entitled to a refund of part of the Finance Charge.

**Contract Provisions:** You can see the terms of this Contract for any additional information about nonpayment, default, any required repayment before the scheduled date, and prepayment refunds and penalties.

**CREDIT INSURANCE:** Credit (life, credit disability (accident and health), and any other insurance coverage quoted below, are not required to obtain credit and we will not provide them unless you sign and agree to pay the additional premium. If you want such insurance, we will obtain it for you (if you qualify for coverage). We are quoting below ONLY the coverages you have chosen to purchase.

**Credit Life: Insured** _____
☐ Single ☐ Joint Prem. $ _____ Term _____
**Credit Disability: Insured** _____
☐ Single ☐ Joint Prem. $ _____ Term _____

Your signature below means you want (only) the insurance coverage(s) quoted above. If none are quoted, you have declined any coverages we offered.

_____  _____
Buyer          d/o/b    Buyer          d/o/b

**PROPERTY INSURANCE:** You must insure the Property securing this Contract. You may purchase or provide the insurance through any insurance company reasonably acceptable to us. The collision coverage deductible may not exceed $ _____ .
If you get insurance from or through us you will pay $ _____
for _____ of coverage.
This premium is calculated as follows:
☐ $ _____ Deductible, Collision Coverage $_____
☐ $ _____ Deductible, Comprehensive Cov. $_____
☐ Fire-Theft and Combined Additional Coverage $_____
☐ _____ $ _____

**If you get insurance from or through us, such insurance ☐ will ☐ will not provide coverage for personal liability and property damage caused to others.**

☒ **SINGLE-INTEREST INSURANCE:** You must purchase single-interest insurance as part of this sale transaction. You may purchase the coverage from a company of your choice, reasonably acceptable to us. If you buy the coverage from or through us, you will pay $ _245_ for _113 weeks_ _____ of coverage.

☒ **SERVICE CONTRACT:** With your purchase of the Vehicle, you agree to purchase a Service Contract to cover _____
_power train_
_____. This Service Contract will be in effect for _12,000 miles / 12 months_

**ASSIGNMENT:** This Contract and Security Agreement is assigned to _ATLANTIC COAST CAPITAL_
the Assignee, phone _860-210-1275_. This assignment is made ☐ under the terms of a separate agreement. ☐ under the terms of the ASSIGNMENT BY SELLER on page 2. ☐ This assignment is made with recourse.
Seller: By _Tatjana Ivanovic_ Date _05/23/05_

## ITEMIZATION OF AMOUNT FINANCED

| | | |
|---|---|---|
| Vehicle Price (incl. sales tax of $ _488.61_ ) | $ | _7488.64_ |
| Service Contract, Paid to: _1 Automotive_ | $ | _895.00_ |
| Amount to Finance line e. (if e. is negative) | $ | |
| **Cash Price** | $ | _8383.64_ |
| Manufacturer's Rebate | $ | |
| Cash Down Payment | $ _2000.00_ | |
| Deferred Down Payment $ _____ | | |
| a. Total Cash/Rebate Down | $ | _2000.00_ |
| b. Trade-In Allowance $ _____ | | |
| c. Less: Amount owing $ _____ | | |
| Paid to: _____ | | |
| d. Net Trade-In (b. minus c.) | $ | |
| e. Net Cash/Trade-In (a. plus d.) | $ | _2000.00_ |
| **Down Payment** (e.; disclose as $0 if negative) | $ | _2000.00_ |
| **Unpaid Balance of Cash Price** | $ | _6383.64_ |
| Paid to Public Officials - Filing Fees | $ | |
| Insurance Premiums* | $ | |
| To: _Ohio Indemnity for USI_ | $ | _245.00_ |
| To: _N. B. Auto Sales for Conv. Fee_ | $ | _249.00_ |
| To: _DMV for Reg_ | $ | _135.00_ |
| To: _____ | $ | |
| Total Other Charges/Amounts Pd. to Others | $ | |
| Less: Prepaid Finance Charges | $ | |
| **Amount Financed** | $ | _7012.64_ |

*We may retain or receive a portion of this amount.

**BY SIGNING BELOW BUYER AGREES TO THE TERMS ON PAGES 1 AND 2 OF THIS CONTRACT AND ACKNOWLEDGES RECEIPT OF A COPY OF THIS CONTRACT.**

**NOTICE TO THE BUYER**
1. Do not sign this contract before you read it or if it contains any blank space. 2. You are entitled to a completely filled-in copy of the contract when you sign it. 3. Under the law, you have the following rights, among others: (a) To pay off in advance the full amount due and obtain a partial refund of any unearned finance charge; (b) to redeem the property if repossessed for a default; (c) to require, under certain conditions, a resale of the property if repossessed.

Buyer: _____
Signature      _05-23-05_
               Date

_____
Signature      Date

Seller: By _Tatjana Ivanovic_

# RETAIL PURCHASE ORDER FOR MOTOR VEHICLE

Date 05-23-2005

Salesperson _____

Bus. Phone _____

Purchaser's Name **Sophia Adu**

Phone _____

Address **625 Burritt Str.**  City **New Britain**  State **CT**  Zip **06053**

Please Enter ☐ DEMONSTRATOR
My Order For ☒ USED ☐ NEW **2001 Mits Galant**

Stock No. _____
To Be Delivered
On or About _____

(YEAR & MAKE)  (MODEL)

Ident. No. **4A3AA46G11E030705**  Trim ____ Color ____

BODY TYPE ____  SOCIAL SECURITY # ____  DATE OF BIRTH ____

THE MILEAGE AS SHOWN BY THE ODOMETER OF THE MOTOR VEHICLE TO BE PURCHASED IS: **83294**

FILL OUT THIS SECTION IF USED CAR OR TRUCK IS TO BE TRADED IN AS PART PAYMENT AND DO WARRANT THE TITLE THERETO TO BE FREE AND CLEAR, EXCEPT FOR THE UNPAID BALANCE, AS SHOWN, AND TO THE BEST OF MY KNOWLEDGE, I THE UNDERSIGNED, STATE THAT THE MILEAGE AS SHOWN ON THE ODOMETER _____ IS THE ACTUAL MILEAGE WHICH THE CAR HAS BEEN DRIVEN.

WRITTEN PROMISES MADE TO PURCHASER
_____
_____
_____

| Make & Year Of Used | Car Truck | | Reg. No. | |
|---|---|---|---|---|
| Model | | Cyl. | Body Type | |
| Ident. No. | | | Title No. | |
| Allowance $ | | Balance Owed $ | | |
| To Whom Owed | | | | |
| Net Allowance | | $ | | |

PURCHASER'S SIGNATURE ____  AUTHORIZED DEALER'S SIGNATURE ____

**PURCHASER'S WAIVER OF DEFECT**
I WAIVE THE WARRANTY OF THE FOLLOWING DEFECT(S) FOR THIS VEHICLE:
_____
_____
_____

PURCHASER'S SIGNATURE ____  AUTHORIZED DEALER'S SIGNATURE ____

☐ NO INSURANCE IS INCLUDED IN THIS ORDER

☐ Enter My Order For Insurance as follows:
☐ Fire and Theft $ ____  ☐ Collision Amount Deductible $ ____  ☐ Property Damage $ ____
☐ Life $ ____  ☐ Accident and Health $ ____  ☐ Auto Medical $ ____

My Insurance Company is ____  Address ____

CT. Insurance I.D. No. ____

☐ THIS MOTOR VEHICLE NOT GUARANTEED  Purchaser's Signature X ____

**$3,000 OR MORE BUT LESS THAN $5,000**
☐ THIS MOTOR VEHICLE IS GUARANTEED TO BE MECHANICALLY OPERATIONAL AND SOUND FOR A PERIOD OF 30 DAYS OR 1,500 MILES WHICHEVER PERIOD ENDS FIRST. THIS GUARANTEE SHALL INCLUDE THE FULL COST OF BOTH PARTS AND LABOR. ALL LABOR MUST BE PERFORMED IN OUR SHOP. NO OUTSIDE INVOICE FOR REPAIRS CAN BE HONORED BY US.

**$5,000 OR MORE**
☒ THIS MOTOR VEHICLE IS GUARANTEED TO BE MECHANICALLY OPERATIONAL AND SOUND FOR A PERIOD OF 60 DAYS OR 3,000 MILES WHICHEVER PERIOD ENDS FIRST. THIS GUARANTEE SHALL INCLUDE THE FULL COST OF BOTH PARTS AND LABOR. ALL LABOR MUST BE PERFORMED IN OUR SHOP. NO OUTSIDE INVOICE FOR REPAIRS CAN BE HONORED BY US.
THIS MOTOR VEHICLE NOT GUARANTEED IF LESS THAN $3,000 OR 7 YEARS OF AGE OR OLDER.

☐ **"AS IS"**
THIS VEHICLE IS SOLD "AS IS". THIS MEANS THAT YOU WILL LOSE YOUR IMPLIED WARRANTIES. YOU WILL HAVE TO PAY FOR ANY REPAIRS NEEDED AFTER SALE. IF WE HAVE MADE ANY PROMISES TO YOU, THE LAW SAYS WE MUST KEEP THEM, EVEN IF WE SELL "AS IS". TO PROTECT YOURSELF, ASK US TO PUT ALL PROMISES INTO WRITING.

PURCHASER'S SIGNATURE ____

☐ THIS INFORMATION YOU SEE ON THE WINDOW FORM FOR THIS VEHICLE IS PART OF THIS CONTRACT. INFORMATION ON THE WINDOW FORM OVERRIDES ANY CONTRARY PROVISIONS IN THE CONTRACT OF SALE.

PLEASE FINANCE AS FOLLOWS:
Name of Co. **ATLANTIC COAST CAPITAL**

Contract ____  At $ ____
Payment { **113 weeks**  At $ **75.86**
First Payment Due **weekly beginning 06-0 2005**

| | |
|---|---|
| SELLING PRICE OF CAR OR TRUCK | 7000 |
| EXTRA OR OPTIONAL EQUIPMENT *Warranty* | 895 |
| *Doc Fees* | 249 |
| CASH PRICE | 8144 |

**THE DEALER CONVEYANCE FEE IS NOT PAYABLE TO THE STATE OF CONNECTICUT**

| LIC. | REG. | TRANS. | TITLE | LIEN | |
|---|---|---|---|---|---|
| | | | | | 135 |

| | |
|---|---|
| SALES TAX | 488 |
| 1. TOTAL CASH PRICE DELIVERED | 8767 |

| 2. CASH DOWN PAYMENT | DEPOSIT SUBMITTED WITH ORDER | |
|---|---|---|
| | CASH ON DELIVERY | 2000 |

NO REFUND OF DEPOSIT

| 3. TRADE IN | | |
|---|---|---|
| LESS | BALANCE OWING TO | |
| 4. TOTAL DOWN PAYMENT | (2 - 3) | 2000 |
| 5. UNPAID BALANCE OF CASH PRICE | (1 - 4) | 6767 |
| 6. OTHER CHARGES | INSURANCE | |
| | VENDOR'S SINGLE INTEREST FEE | 245 |
| 7. AMOUNT FINANCED (The amount of credit provided to you or on your behalf.) | (5 + 6) | 7012 |
| 8. FINANCE CHARGE * | (THE DOLLAR AMOUNT THE CREDIT WILL COST YOU) | 1559 |
| 9. TOTAL OF PAYMENTS (The amount you will have paid after you have made all payments as scheduled) | (7 + 8) | 8572 |
| 10. TOTAL SALE PRICE The total cost of your purchase on credit including your down payment of $ | (1 + 6 + 8) | 10572 |
| 11. ANNUAL PERCENTAGE RATE | | % 1 |

I have read the terms and conditions on the back hereof and agree to them as a part of this order the same as if they were printed above my signature. The front and back hereof comprise the entire agreement affecting this order and no other agreement or understanding of any nature concerning same has been made or entered into. I hereby acknowledge receipt of a copy of this order, and certify that I am of legal age. **THIS ORDER SHALL NOT BE BINDING UPON THE SELLER UNTIL IT IS ACCEPTED BY ITS AUTHORIZED OFFICER AS SHOWN BY HIS SIGNATURE ON THE ORIGINAL ORDER ON THE FORM BELOW.**

Purchaser's Signature: And I have received a copy of this order X ____

Accepted By **New Britain Auto Sales**  Dealer Recommended By: ____

By **Ivanon' Tatauo, Manager**  (Name and Title)  Date **05-23-200**

FINAL PAYMENT CASH OR CERTIFIED CHECK    SEE OTHER SIDE FOR ADDITIONAL TERMS AND CONDI





**MASSACHUSETTS UNIFORM CITATION**

TYPE OF CITATION — MOTOR VEH.

**M2125493**

DATE CITATION WRITTEN: WED D 13 05
AGENCY CODE: SC6
OFFICER I.D. NUMBER: 2355
COURT CODE: 62
☐ OPER. ☐ OWNER

MOTOR VEHICLE LICENSE ID. VIOLATOR: 598235004
STATE: MA
CLASS: D
COL LICENSE ☐ YES ☐ NO
RACE: B
SEX: M
NON-INVENTORY MV SEARCH ☐ NO ☐ YES
CODE

VIOLATOR NAME (Last): WILSON
(First): Scott
(mid): A
DATE OF BIRTH: MAS DEC 66

ADDRESS: 51 School St Apt #2
CITY/TOWN: Southbridge
STATE: MA
ZIP: 01550

PLATE TYPE: PAN
MOTOR VEHICLE REGISTRATION NO.: 450
STATE: CT
COL VEHICLE ☐ YES ☐ NO
HAZARDOUS MATERIAL ☐ YES ☐ NO
MAKE AND TYPE: Mitsubishi Galant
YEAR: 01
COLOR: BLK

DATE OF OFFENSE: WED D 13 05
LOCATION OF OFFENSE: Rt 90 e 3401.85 / IC-10 Auburn
TIME OF OFFENSE: 2130 ☐ AM ☐ PM
ACCIDENT ☐ YES ☐ NO

CHAP/SEC/SUB: 90/07
A. ☐ CRIM ☐ CIVIL
DESCRIPTION OF OFFENSE: Defective Equipment
ASSESSMENT $

B. ☐ CRIM ☐ CIVIL    $

C. ☐ CRIM ☐ CIVIL    $

D. SPEEDING: ☐ 90/17 ☐ 90/18   CIVIL
MPH IN A
MPH ZONE
☐ POSTED ☐ NOT POSTED ☐ LIDAR
☐ CLOCKED ☐ RADAR ☐ ESTIMATED
$

TOTAL $

OFFICER CHECK ONE ONLY: ☐ ALL CIVIL INFRACTIONS (See Instruction A on back)    ☐ CRIMINAL APPLICATION (See Instruction B on back)    ☐ ARREST    ☐ WARNING No action required by violator)

COURT ADDRESS

OFFICER CERTIFIES ☐ IN HAND TO VIOL. ☐ MAILED TO VIOL. ☐ IN HAND TO VIOLATOR'S AGENT
X

AGENT NAME

VIOLATOR/AGENT ACKNOWLEDGES RECEIPT OF CITATION
X

AGENT'S LICENSE NUMBER & STATE

OFFICER COPY