UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA        )
                                )
            v.                  )        Cr. No. 05-40035-FDS
                                )
RICHARD BOTCHWAY,               )
                                )
            Defendant.          )

### GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS

The United States of America, by Assistant U.S. Attorney David Hennessy, files this memorandum of law in opposition to Defendant Richard Botchway's motion to suppress evidence on the ground that it is the product of an unconstitutional search, and to suppress statements on the ground that the statements are the fruit of the unconstitutional search.  The motion to suppress is without merit and should be denied without a hearing.

### FACTS

On July 13, 2005, at approximately 9:30 p.m., Massachusetts State Trooper William Pinkes was monitoring traffic at the Massachusetts Turnpike exit in Auburn.  Pinkes saw a 2001 Mitsubishi with Connecticut plates drive past him.  Pinkes noticed that the car had a defective brake light in that the amber light was stuck in the "on" position.  Pinkes stopped the Mitsubishi and approached on the passenger side.  There were three male occupants: one lying across the rear seat, the other two in front passenger

1

and driver seats.  Pinkes asked the driver for his license and registration.  The driver presented a Massachusetts license in the name of Scott A. Wilson, but was unable to produce registration.

Pinkes asked Wilson to exit the car so that Pinkes could ask about ownership.  Wilson became extremely nervous and stammered in response to simple questions, repeating the question before answering and looking around when answering.  Wilson said that they were returning from visiting the passenger's girlfriend in Connecticut.  As this occurred, the passenger, later identified as Defendant, opened the passenger door and vomited onto the ground.

Upon returning Wilson to the car, Pinkes asked Botchway for identification.  Botchway produced an expired New Jersey identification card.  Contrary to what Wilson reported, Botchway stated that they were traveling from Delaware and going to Leicester.  He said they had stopped in the Bronx to visit friends, but was unable to provide their names, addresses or phone numbers.

Pinkes then questioned the rear passenger who produced a Massachusetts license identifying him as Sanusi Mohammed.  Mohammed was very nervous and evasive.  In sum, he said that the car belonged to his girlfriend Sophia, and that he went with Wilson to Delaware to pickup Botchway.  There were no clothes in the passenger compartment of the car, and when questioned, Botchway said, in substance, there were no clothes in the trunk.

When other Troopers arrived, Pinkes asked Mohammed for consent

2

to search the car.  Mohammed waved toward the car and said, "I have no problem; look all you want."  In the trunk, Pinkes saw two computers, a scanner, monitor, printer and briefcase.  Inside the briefcase, Pinkes located papers belonging to Botchway.  Pinkes asked Botchway if the briefcase belonged to him and Botchway replied that it did.  Inside were, among other things, credit cards, checkbooks, and credit card applications in the names of third parties, not Botchway's.  Botchway said that he made identification documents for people and that he had found the credit cards.  Botchway said he used the computer equipment to make such documents.  Pinkes seized the computer equipment and identifications and issued a citation for the defective tail light.

On July 14, 2005, Special Agent Cummings from Immigration and Customs Enforcement ("ICE") arrived at the State Police Barracks in Holden (where Pinkes was stationed).  They arranged for Botchway to come to the station.  Botchway arrived.  Cummings questioned him. Botchway admitted that he had come to the U.S. on a student visa in or about June of 1985.  Cummings took him into custody and placed him in ICE administrative detention as an unlawful overstay.

ICE determined that identification in Botchway's name that was recovered from the briefcase were fraudulent.  Further, a search of the computer equipment disclosed digital images of several of the fraudulent forms of identification.

I.   **THE SEARCH OF THE CAR AND BRIEFCASE WAS REASONABLE**

3

Defendant claims that the search of the car pursuant to which equipment he used to make illegal identifications was recovered violated the Fourth Amendment.   There are two issues involved in defendant's claim.   The first is whether an occupant of the car gave Pinkes consent to search.    The second issue is how broadly to construe the consent where there is no express or implied limitation placed on the consent.

**A.   Mohammed gave Pinkes Consent**

Even without a hearing, the existing record shows that Pinkes was given consent to search after stopping the car.   First, Pinkes prepared a report in which he stated that he was given consent.   See Ex.A to Def. motion.   Second, there was nothing inherently inculpatory about the nature of the document-making equipment Pinkes discovered during the search.   Hence, no one would be likely to withhold consent for fear of discovery of incriminating evidence.

To impeach Pinkes, Defendant suggests that there was no broken tail light, and that the stop was the product of racial profiling. Defendant relies on a citation from photograph taken in New York 3 days before the arrest, and on an opinion by a Worcester Superior Court judge in which evidence seized at a car stop at which Pinkes was present was suppressed based on evidence of racial profiling. This attack is without merit.

First, in this case, Pinkes issued a citation for a defective

4

tail light.  See Exhibit E to Defendant's motion.  Clearly, Pinkes was authorized to stop a car with a defective brake light, and the citation is evidence of the defect.  If there had been no broken tail light, Defendant could have challenged the citation at the time of its issuance.  To our knowledge, no such challenge was made.  Indeed, having gone to the Holden Barracks the day after the stop to reclaim property, Defendant could have shown that the citation was unfounded if, in fact, it was.

Second, the photograph of the car 3 days before the stop is not persuasive evidence of the condition of the brake light. First, the photograph was taken on a summer afternoon of the car crossing a well-lighted intersection and, if we read the notice correctly, as the car was driving east; that is, as the sun was behind the car.  In any case, the photograph is simply not relevant to the condition of the car 3 days later, particularly after it had been driven from New York to Delaware, and from Delaware to Central Massachusetts.  At any time during that trip, the malfunction could have been caused.[1]

As for Defendant's claim of racial profiling and his reliance on Commonwealth v. Lora, 2003 WL 22350945 (Mass. Super.), we submit his characterization of the facts of that case is both inaccurate

---

[1]If the Court determined that the condition of the car on another occasion were relevant, we would ask the Court to take notice of a "Lemon Law" notice, attached hereto, of incidents of the brake lamp becoming stuck in the on and off position of prior model years of the Mitsubishi Galant.

and unfair.  As a reading of the case shows, Pinkes did not engage in any racial profiling, nor could he have.  There, the car was stopped by another trooper, and not Pinkes.  Pinkes did no more than respond to a request for assistance a considerable time after the car had been stopped:

> Approximately ten-to-fifteen minutes [after Trooper Shugrue had stopped the car and called the barracks for assistance] . . . Pinkes arrived at the scene. . . . During the search, Pinkes acted as a cover officer, a trooper that provides back up by monitoring suspects while the investigating trooper performs his duties.

Lora, at *3.  Moreover, whatever statistical data about Pinkes factored into the decision to suppress in Lora is largely irrelevant here since, as Judge Swartwood noted in denying a motion for a Rule 17c subpoena, there is no evidence here that Pinkes knew the race of the occupants of the car when he stopped it.  See United States v. Pinkes, 05-40035-FDS (January 18, 2006) at 5.  For all these reasons, this Court should find that Pinkes was given consent to search the car.

**B.  Mohammed's Consented was not Limited**

The second issue is how to construe the consent where there is no express or implied limitation placed on the consent and no objection is made.  In such a case, consent is to be construed broadly.

**1.  Applicable Law**

The warrant and probable cause requirements of the Fourth

Amendment protect the right of people to be secure in their effects against "unreasonable searches and seizures." However, it is "well settled that one of the specifically established exceptions to the requirements of a warrant and probable cause is a search that is conducted pursuant to consent." Schnekloth v. Bustamonte, 412 U.S. 218, 219 (1973). Consent must be voluntary, a question of fact to be determined from all the circumstances. The government bears the burden of showing voluntariness. Id. at 248-49.

The government can meet its burden by showing that consent was given by a third party who possessed common authority over and a sufficient relationship to the premises or effects sought to be searched. United States v. Matlock, 415 U.S. 164, 171 (1974)(consent of woman with common authority over bedroom to search diaper bag in bedroom closet); Frazier v. Cupp, 394 U.S. 731 (1969)(owner of duffel bag who permitted friend to use bag jointly assumed the risk that friend would give consent to search bag). Common authority can be inferred from mutual use of the property by persons having joint access and control for most purposes. Matlock, 415 U.S. at 171, n.7.

Where an occupant of a car voluntarily consents to a search of the car, police may search containers within that vehicle without obtaining additional consent. Jimeno v. Florida, 500 U.S. 248, 250 (1991)(consent to search vehicle was sufficient to authorize search of paper bag containing drugs on floor of car); United States v.

7

_Zapata_, 18 F.3d 971, 977-78 (1st Cir. 1994)(consent to search vehicle for narcotics included implied consent to search duffel bags within trunk). "[A] general consent to search a motor vehicle subsumes the specific consent to search any easily accessible containers within the vehicle." _Id_. at 978; _United States v. Navarro_, 169 F.3d 228, 231 (5th Cir. 1999)(driver's consent to search vehicle included consent to search passenger's luggage in backseat because driver never told officer that luggage did not belong to him); _United States v. Reeves_, 6 F.3d 660, 662 (9th Cir. 1993)(consent to complete search of vehicle included implicit consent to search locked briefcase). Consent can be implied from the circumstances, including from a person's failure to object to the search, _see Navarro_, 169 F.3d at 231; _United States v. Morales_, 861 F.2d 396, 399-400 (3d Cir. 1988)(consent implied because passenger lessee of rental car remained silent after driver consented and search occurred); or from surrendering the keys needed to open a trunk. _See Zapata_, 18 F.3d at 977. The government must show that it was "objectively reasonable" under the circumstances for an officer to believe that consent to search a car extends to a container in it. _Jimeno_, 500 U.S. at 250.

## 2. Analysis

Applying these principles, here the search of the trunk and brief case was constitutionally proper. Before conducting a search, Pinkes obtained permission to search the car from Mohammed,

who had told Pinkes that the car belonged to his girlfriend. Mohammed gave unqualified consent: he waved at the car, and stated "I have no problem; look all you want." Both Mohammed's gesture and words conveyed unlimited consent to search the car, the trunk and everything in it. <u>See</u> <u>Reeves</u>, 6 F.3d at 662 (consent's form use of the word "complete" indicated that the consent extended to everything within the car); <u>Jimeno</u>, 500 U.S. at 252 (suspect placed no explicit limitation on scope of consent to search).

Moreover, the evidence shows that Botchway neither qualified the consent nor objected. Botchway was silent when Mohammed gave consent in both word and gesture; Botchway was silent when Trooper Pinkes opened the trunk and searched pursuant to Mohammed's consent; and Botchway was silent even when Trooper Pinkes asked Botchway if the briefcase was his. Under the circumstances, Trooper Pinkes was justified in concluding that Botchway's briefcase was within the scope of Mohammed's consent.

Moreover, the facts indicated that the car, the trunk and its contents were under the joint access and control of each of the occupants of the car. Botchway, Mohammed and Scott reported that they were traveling together from Delaware, and made stops together along the way. The duration and length of the trip suggested that the car was jointly controlled. Given the foregoing, it was reasonable, under these circumstances, for Trooper Pinkes to infer that Mohammed had common authority to consent.

Defendant relies largely on <u>United States v. Infante-Ruiz</u>, 13 F.3d 498 (1st Cir. 1994).  Although the facts of <u>Infante-Ruiz</u> resemble the instant case, there is a critical difference that makes the holding inapplicable here.  In particular is the very rationale of the holding:

> What leads us to hold that the scope of de la Paz's consent did *not* include the defendant's briefcase [in the trunk of the car] is that de la Paz's general permission to search the car and trunk was qualified by de la Paz's further statement to the officer, before the latter opened and searched the briefcase, that the briefcase belonged to Infante.  Even though Infante was nearby, handcuffed in the squad car, the police officers never sought his permission to search his briefcase.  We do not think it was "objectively reasonable," in these circumstances, for the officer to believe that de la Paz's prior consent to search the vehicle and its trunk encompassed opening that particular briefcase, later clearly identified by de la Paz as belonging solely to another nearby passenger.  De la Paz's identification of the briefcase as belonging to another nearby passenger suggested precisely the contrary.

<u>Id</u>. at 505 (emphasis original).  Indeed, the court noted that all the other facts of <u>Infante</u> supported finding that the consent to search the car extended to the briefcase.  <u>Id</u>.  It is these later facts that support the finding of consent here.  Before Pinkes searched the briefcase here, there were no facts putting him on notice that Mohammed's unlimited consent did not extend to the briefcase.  None of the occupants of the car, and especially Botchway, all of whom were sitting nearby and could see the trunk of the car raised and Pinkes standing at the open trunk carrying out a search he asked permission to conduct, voiced any objection.

10

Precisely because no one identified the briefcase as belonging to Botchway or otherwise limited the scope of the consent, it was objectively reasonable, under the circumstances, for Trooper Pinkes to search it. The motion to suppress should be denied.

## II. THE STOP OF THE CAR WAS REASONABLE

Defendant claims that the stop of the car was unlawful. This claim is without merit. Where officers have probable cause to believe that a violation of the traffic code has occurred, a stop of the car is reasonable. Whren v. United States, 517 U.S. 806, 818-19 (1996). Here, as noted above, the record shows that Pinkes determined that the brake light on the car was defective. Pinkes even had Wilson exit the car to see the defect. The stop was reasonable.

## III. DEFENDANT HAS FAILED TO SHOW AN EQUAL PROTECTION CLAUSE VIOLATION

Defendant claims that there is evidence of racial profiling in data collected regarding Pinkes, and the stop in this case needs to be evaluated in light of such data. Defendant also asserts that the remedy for racial profiling is suppression. These claims are without merit.

It has been recognized that consensual searches may violate the Equal Protection Clause when initiated solely based on racial considerations. United States v. Travis, 62 F.3d 170, 173 (6th Cir. 1995); United States v. Frazier, 408 F.3d 1102, 1108 (8th Cir.

11

2005).  A defendant would have to demonstrate by a "preponderance of the evidence" that a police officer decided to approach him or her solely because of his or her race.  <u>Travis</u>, 62 F.2d at 174; <u>Frazier</u>, 408 F.3d at 1108.  However, in instances where officers seek consent for many reasons, some of which are legitimate and some of which may be improperly based on race, the use of race does not give rise to any constitutional protections.  <u>Travis</u>, 62 F.3d at 174.  "Consequently, when officers compile several reasons before initiating an interview, as long as some of those reasons are legitimate, there is no Equal Protection Violation."  <u>Id</u>. <i>citing</i> <u>Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle</u>, 429 U.S. 274 (1977).  <u>Travis</u> did not determine remedy, should a violation be found, noting that "exclusionary rule usually applies only to violations of the Fourth Amendment."  <u>Id</u>.

The applicable law raises a number of insurmountable hurdles to Defendant's claim here.  First, Defendant has failed to demonstrate that race was the motive for stopping the car here, and certainly has failed to show that it was the sole motive.  In this regard, he has failed to show that Pinkes was even aware of the race of the occupants of the car when he stopped it.  In addition, the statistics cited from <u>Lora</u> are not useful.  They focus exclusively on the race of the operator of the car and report nothing about the race of occupants.  They are based exclusively on cases where citations issued or arrests were made, and hence report

nothing about car stops and searches made by Pinkes involving "innocent" encounters which did not result in citations or arrests. Moreover, the statistics are expressed in percentages, but cover only a seven-week period of Pinkes' patrol work; a single statistic would arguably work a dramatic change in percentages.

Second, because the car was stopped for a traffic violation, even if there were reliable evidence of racial profiling in Pinkes' past practices – and we submit Defendant has presented none – it is plainly not the sole reason for the stop (unless the Court rejected the evidence of a defective light). Pinkes' report, the citation he issued, the lack of a challenge show there was a traffic violation. Hence, there is no Fourteenth Amendment violation.

Third, in the case of a stop based solely on race, as <u>Travis</u> notes, it is unclear under the Fourteenth Amendment as to what the appropriate remedy is. We submit the actions of a state court judge in an entirely separate case, applying Massachusetts law, are a poor guide for what would be an appropriate remedy, should the Court find a violation.

For all these reasons, the Equal Protection Clause claim should be summarily dismissed.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:  <u>/s/ David Hennessy</u>
David Hennessy
Assistant U.S. Attorney

13

<u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served upon the person listed below a copy of the foregoing document by depositing in the United States mail a copy of same in an envelope bearing sufficient postage for delivery:

> Keith Halpern
> 4 Longfellow Place
> 37th Floor
> Boston, Massachusetts 02114-2838

This 10th day of April, 2006.

>   /s/ David Hennessy
> David Hennessy
> Assistant U.S. Attorney



# onecle

Google [                    ] Search

○ Web ◉ onecle.com

## USA

- Buick
- Cadillac
- Chevrolet
- Chrysler
- Dodge
- Ford
- GMC
- Hummer
- Jeep
- Lincoln
- Mercury
- Oldsmobile
- Pontiac
- Saturn

## Europe

- Aston Martin
- Audi
- Bentley
- BMW
- Ferrari
- Jaguar
- Lamborghini
- Land Rover
- Lotus
- Maserati
- Mercedes Benz
- Mini
- Porsche
- Rolls Royce
- Saab
- Volkswagen
- Volvo

## Japan

- Acura
- Honda
- Infiniti
- Isuzu
- Lexus
- Mazda
- Mitsubishi
- Nissan
- Subaru
- Suzuki
- Toyota

## Korea

Lemon Law Home > All Vehicle Makes > MITSUBISHI > GALANT > 1994 >

Ads by Goooooogle    Advertise on this site   Ads by Goooooogle    Ad

**Used Cadillac Auto Parts**
Quality Used Cadillac Car Parts Free Shipping & 30 Day Warranties
www.partsjobber.com

**Replacement Tail Lights**
Fix Your Broken Tail Light With Low Price Aftermarket Replacement
www.YourAutoPartStore.com

**Automotive LED Lighting**
Interior, exterior lighting High current LED driver ICs
www.maxim-ic.com

**No Ugly Orange Bulbs**
Premier Silver Coated Signal Bulbs DOT Legal. Lifetime Guarantee!
www.StealthAuto.com

**Altezza Taillight Kit**
Altezza Taillight in JDM Black, Chrome, C more
www.racinglab.com

**led tail lights for cars**
Newest, stylish, safest on the road led tail light
www.partsngo.com

**L.E.D. Trailer Lights**
Low Cost, High Quality L.E.D Lights For T Buses, Etc.
www.led-r-us.com

**Volvo Lamps Lenses Hubcap**
Headlights, Tail lamps, Hubcaps Grills, an
www.lampsandlenses.com

**Make :** MITSUBISHI      **Model :** GALANT

**Build Dates :** 19930701 - 19941223

**NHTSA CAMPAIGN ID Number :** 98V212000

**Date Owner's Notified:** 19981130      **Date Received by ODI:** 19980908

**Manufacturer's Involved:** MITSUBISHI AMERICA

**Manufacturer's Responsible for the Recall:** MITSUBISHI MOTORS NORTH AMERICA, INC.

**Manufacturer Campaign Number:**

**Component:** EXTERIOR LIGHTING:TAIL LIGHTS:SWITCH

**Potential Number Of Units Affected :** 17079

**Summary:**
   VEHICLE DESCRIPTION: PASSENGER VEHICLES. WHEN THE STOP LAMP SWITCH W. INADVERTENTLY APPLIED TO THE CONTACT POINT. THIS CAN CAUSE THE CONTACT P OPERATION ELEMENTS TO MELT ALLOWING THE SWTICH TO BECOME STUCK IN ON OI

**Consequence:**
   THIS CONDITION CAN CAUSE THE ANTI-LOCK BRAKING SYSTEM (ABS) WARNING LIC

**Remedy:**
   DEALERS WILL INSTALL A RELAY AND REPLACE THE BRAKE LAMP SWITCH.

**Report Initiator:** ODI

**Regulation Part Number:**      **Federal Motor Vehicle Safety Standard Num**

**Notes:**
   CUSTOMERS CAN ALSO CONTACT THE NATIONAL HIGHWAY TRAFFIC SAFETY ADMI 1-888-DASH-2-DOT (1-888-327-4236).