## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

——————————————————————— )
UNITED STATES of AMERICA ) )
 )
v. )           **Criminal No.**
 )           **05-40035-FDS**
RICHARD BOTCHWAY, )
 )
Defendant. )
———————————————————————)

## <u>MEMORANDUM AND ORDER ON MOTION TO SUPPRESS</u>

**SAYLOR, J.**

This is a criminal prosecution for unlawful possession of a document-making implement in violation of 18 U.S.C. § 1028(a)(5).  Defendant Richard Botchway has moved to suppress certain physical evidence and related statements on the grounds that they are the products of an unconstitutional search.

The physical evidence at issue was discovered as a result of the stop of an automobile, in which Botchway was riding as a passenger, for a defective brake light.  After the trooper became suspicious of the occupants, he requested a consent to search the vehicle.  Another passenger, Sanusi Mohammed, agreed.  The trooper then found the evidence in a closed briefcase belonging to Botchway that was located in the trunk of the car.  The statements at issue were made as a direct consequence of the search.

As described below, although Mohammed had apparent authority to consent to the search of the vehicle, he did not have actual or apparent authority to consent to a search of Botchway's closed briefcase in the trunk.  Accordingly, the search was unreasonable within the meaning of the Fourth Amendment, and the motion to suppress will be granted.

## I.      Background

Richard Botchway is a citizen of Ghana.  He came to the United States on a student visa in 1985, overstayed his visa, and is presently in the country illegally.

On July 13, 2005, at approximately 9:30 p.m., Massachusetts State Trooper William Pinkes was monitoring traffic at the Massachusetts Turnpike exit in Auburn, Massachusetts. Pinkes observed a black 2001 Mitsubishi Galant sedan with Connecticut license plates drive by.[1]

According to Pinkes, the left brake light was stuck in the "on" position.  He activated his patrol car's emergency lights and pulled the car over to the side of the highway.  As he pulled up behind the stopped car, he activated the high beams of his patrol car, illuminating the interior of the Mitsubishi.

Pinkes testified that he approached the vehicle on the passenger side.  From that side, he asked the operator for his driver's license and registration.  The automobile had three occupants: two in the front and one lying prone across the back.  All three occupants were black; Pinkes is white.

The driver, Scott Wilson, produced a license but was unable to produce a registration. Pinkes then asked him to step out of the car and to its rear.  Pinkes testified that he had two purposes in doing so:  to show Wilson the defective light and to inquire about the ownership of the car away from the other occupants.

Pinkes testified that when he asked Wilson about the ownership, Wilson began to stammer, appeared very nervous, and repeated Pinkes's questions back to him.  When Pinkes

---

[1] The sun had set that evening at 8:23 p.m., and civil twilight had ended at 8:57 p.m.  It is unclear how much light remained at the time the vehicle passed Pinkes.

questioned where they had come from, Wilson responded that they had come from Connecticut, where they had been at the home of a passenger's girlfriend.  Wilson also stated, in response to questioning, that he did not know to whom the car belonged.

According to Pinkes, during this exchange, the front passenger door of the car opened and the passenger leaned out and vomited alongside the highway.  Pinkes testified that he directed Wilson to return to the car.  He then went up to the passenger and asked for identification; the passenger produced an expired New Jersey driver's license in the name of "Rick Botchway." Pinkes questioned Botchway as to their destination.  Botchway responded that they were traveling to Leicester, Massachusetts, from Delaware, and that they had stopped on the way in the Bronx, New York, to visit a friend.  Pinkes testified that Botchway could not provide a name, address, or telephone number for the friend.  Pinkes ordered Botchway to leave the car and stand near the right front fender.

Pinkes then asked the third passenger, who had been lying across the back seat, for identification.  The passenger produced a Massachusetts driver's license identifying him as Sanusi Mohammed.  Pinkes asked Mohammed to leave the car and stand at its rear.

Once outside the car, Pinkes questioned Mohammed about their travels.  Mohammed responded that he had gone with Wilson two days earlier to Delaware, where they had picked up Botchway, and that they were bringing him to a friend's house in Leicester.  Pinkes asked how long Botchway intended to stay in Leicester; Mohammed responded that it could be a week or a month.  Pinkes then asked whether they had any clothes with them, and Mohammed responded that Botchway had clothes in Leicester.  According to Pinkes, Mohammed was "nervous" and he "seemed evasive."

Pinkes then spoke again to Botchway, asking him about the lack of extra clothing. Botchway told him that he had no extra clothes in the vehicle or at the house in Leicester.

Pinkes returned to his vehicle and requested that another cruiser join him and provide assistance. He then ran checks from his vehicle as to any outstanding warrants, criminal histories, and the ownership of the vehicle.[2]

Other troopers arrived about five minutes later. Pinkes then engaged in further questioning of Mohammed, who told him that the vehicle belonged to his girlfriend, Sophia.

Pinkes then asked Mohammed whether he could search the vehicle. According to Pinkes, Mohammed waved his arm toward the car and said, "I have no problem—look all you want." At the time, Mohammed was standing near the right rear quarter panel of the car.

Pinkes then searched the passenger compartment of the car. The record does not indicate whether he searched the glove compartment or whether the vehicle registration was located there. Pinkes then searched the trunk. He testified that he opened the trunk with either the key or with a key fob containing an electronic trunk key; the record does not indicate how he obtained either.

Pinkes testified that when he opened the trunk, he observed computer equipment, including computers, hard drives, a monitor, and an ID printer, and a black soft-sided briefcase. It appeared that there were no suitcases or clothes in the trunk.

Pinkes then unzipped the briefcase and saw a number of items related to Richard Botchway, including business records, checks, and miscellaneous papers. At some point in his search of the briefcase, Pinkes observed identification cards and credit cards in different names.

---

[2] Trooper Pinkes's incident report identifies the owner of the vehicle as Sophia Adu of New Britain, Connecticut. Presumably, Pinkes obtained that information as a result of his own checking process, as none of the occupants of the vehicle produced a registration.

4

Pinkes then called Botchway to come over; Pinkes asked him if the contents of the briefcase were his, and he responded that they were. Pinkes continued to look through the briefcase and found blank checks, banking transaction records, and other documents with personal and financial information that were not in Botchway's name.

Pinkes questioned Botchway about the items in the briefcase. According to Pinkes's incident report, Botchway stated that "he used the blanks to make work ID's for people," and gave other incriminating responses. Botchway also told Pinkes that he had rented business space and had found the items on the floor.

Pinkes seized the computer equipment and the briefcase and its contents. He did not, however, impound the vehicle or arrest any of its occupants. He issued a written warning to Wilson for driving with a defective brake light, but did not issue a citation for failing to produce a registration.

Apparently at the government's suggestion, Botchway appeared in person the next day, July 14, to pick up the seized computers at the offices of the Bureau of Immigration and Customs Enforcement. He was taken into custody for immigration violations and subsequently made additional incriminating statements.

Sophia Adu, a resident of New Britain, Connecticut, testified at the suppression hearing. Among other things, she testified that she owned the Mitsubishi; that she had purchased it used on May 23, 2005, less than two months prior to the vehicle stop; that it had passed a Connecticut state inspection at that time; that she had never observed any problem with the brake light; and

that she had not taken the car to a mechanic after the stop to have it repaired.[3]  Adu also testified

that she had loaned the car to Wilson, who was her boyfriend, three days before the stop, and that

Mohammed was a close friend of both her and Wilson.  Wilson had told her that they were going

to pick up Botchway (who, she thought, lived in Philadelphia or New Jersey, rather than

Delaware), that they would stop in New York on the way, and that they would return the car to

her in Massachusetts.

Finally, Botchway testified at the hearing.  He testified that Pinkes ordered all three

occupants to leave the car and sit on the ground; that he did not vomit; and that he did not

observe anything wrong with the brake light.  Botchway also submitted an affidavit in which he

stated that no one consented to the search of the car or the briefcase.

## II.    Analysis

### A.    The Initial Stop of the Vehicle

The first issue presented is whether the traffic stop was justified.  In general, an officer

must have probable cause to believe that a violation has occurred before he may stop a motor

vehicle.  *Whren v. United States*, 517 U.S. 806, 810 (1996).

Defendant argues that the basis of the stop—an allegedly defective brake light—was

pretextual, and that the evidence demonstrates that there was nothing wrong with the light.  In

particular, defendant points out that the vehicle had passed an inspection less than seven weeks

earlier; that Adu (the car's owner) and Botchway (who had been riding in the car for some time)

---

[3] Defendant also submitted a copy of a ticket issued by the City of New York to Adu, as owner of the Mitsubishi, for running a red light on July 10, 2005, at 6:50 p.m., three days before the stop.  The ticket was issued under the City of New York Red Light Camera Monitoring Program, and included three poor-quality photographs of the rear of the car.  According to defendant, the photographs do not show the left brake light in the "on" position.  The Court is unable to ascertain either way from the photographs whether the light was on.

had noticed nothing wrong with the light; that the photographs taken in connection with the automated citation from New York City only three days earlier did not show a problem; and that Adu testified that she did not repair any problem with the light.  Although defendant has put forth substantial evidence on the issue, the Court concludes that the preponderance of the evidence favors the government.

First, there is nothing at all unusual about the fact that an automobile could have a defect in a rear light that was not noticed by its owner or any of its operators or passengers.  The problem would not necessarily have been noticeable to the driver or anyone else seated in the passenger compartment.[4]

Second, there is no evidence in the record that any of the three occupants of the vehicle disagreed with Pinkes during the stop as to the condition of the light or otherwise made a contemporaneous protest that the stop was pretextual.

Third, Botchway's testimony must be viewed with great caution, given his interest in the outcome and his criminal history for offenses relating to truthfulness (such as forgery and impersonation).

Fourth, and most significantly, the Court accepts the testimony of Trooper Pinkes with regard to the equipment failure.  Rejecting the trooper's testimony in that regard would necessarily compel the conclusion that he stopped the vehicle either (1) totally at random or (2) because its occupants were black.  The first possibility seems unlikely, if not nonsensical.  In order for the second possibility to be true, the Court would have to infer a racist motive.  While such a

---

[4] The Court also notes that the problem at issue involved the lighting system of an automobile.  Such systems are notoriously subject to defects, such as loose connections, that can cause problems to appear, disappear, or re-appear seemingly at random.

motive is possible, the Court will not infer it lightly.  Furthermore, the Court would have to conclude that Pinkes could determine—from a stationary position in his patrol car—the race of the occupants in a moving vehicle  more than one hour after sunset.  While the Court is not prepared to say that it would have been impossible to do so, it seems unlikely under the circumstances.

Accordingly, the Court concludes, by a preponderance of the evidence, that Pinkes had probable cause to stop the vehicle for an equipment violation.

### B.    The Search of the Automobile

The next issue presented is whether the search of the automobile, including its trunk, was reasonable.  A search conducted without a warrant is presumptively unreasonable unless it falls within an established exception.  *United States v. Romain*, 393 F.3d 63, 68 (1st Cir. 2004).  The government contends that the search here was reasonable because Mohammed consented to the search of the vehicle and its contents.  The government bears the burden of demonstrating, by a preponderance of the evidence, that consent was given knowingly, intelligently, and voluntarily. *United States v. Marshall*, 348 F.3d 281, 285-86 (1st Cir. 2003).

The Court notes at the outset that the trooper's actions in removing the occupants from the vehicle and requesting consent to search were, at the very least, aggressive.  Clearly there was no probable cause to search the vehicle, nor was the trooper searching for anything in particular.[5]

---

[5] At the time Pinkes ordered Wilson out of the car, the only remotely suspicious event was Wilson's failure to produce a registration.  Massachusetts law requires that all motor vehicle operators have the registration available "in some easily accessible place."  Mass. Gen. Laws ch. 90, § 11. The failure to do so, however, is apparently not a crime.  Pinkes testified, in essence, that his suspicions became aroused in the course of the stop because (1) the occupants told apparently differing stories as to their travels, (2) no one produced a registration, (3) Wilson and Mohammed seemed nervous, (4) Botchway vomited, and (5) no clothing or suitcases were visible to the trooper in the passenger compartment and Botchway indicated he had no extra clothes.

Indeed, it appears that Pinkes may have violated Massachusetts law when he ordered Wilson out

of the vehicle.  *See Commonwealth v. Gonsalves*, 429 Mass. 658, 662-63 (1999) (state

constitution requires that police officer in routine traffic stop have a reasonable belief that

officer's safety, or safety of others, is in danger before ordering driver out of vehicle);

*Commonwealth v. Santos*, 65 Mass. App. Ct. 122, 126-27 (2005) (failure to produce license and

registration, without more, not sufficient to justify requiring driver to leave vehicle and putting

him in handcuffs).

Pinkes nonetheless did not violate the Fourth Amendment when he ordered the occupants

out of the vehicle.  *See Pennsylvania v. Mimms*, 434 U.S. 106 (1977).  The question presented,

therefore, is whether Mohammed had authority to consent to a search of the automobile.

A person possessing actual or apparent authority over property may consent to a search of

the property.  *Illinois v. Rodriguez*, 497 U.S. 177, 186 (1990);  *Georgia v. Randolph*, 126 S. Ct.

1515, 1520 (2006).  The standard is objective:  that is, a consent may be given by a person whom

the police reasonably, but erroneously, believe to possess authority over the property.  *Rodriguez*,

497 U.S. at 186.  A person who has common authority over property may consent to its search,

absent an express objection by a person, physically present, with whom such authority is shared.

*Randolph*, 126 S. Ct. at 1528; *see also United States v. Matlock*, 415 U.S. 164, 172 n.7 (1974)

(common authority rests on "mutual use of the property by persons generally having joint access

or control for most purposes.").

Here, it was reasonable for Pinkes to conclude that Mohammed had authority to consent

to the search of the car.  Although Wilson was driving, he stated that he did not know to whom

the car belonged, and did not produce a registration for the vehicle.  Botchway apparently was

9

not questioned about the car's ownership, and in any event there is no evidence that he said anything on the subject.  Mohammed, however, said that the vehicle belonged to his "girlfriend," Sophia.[6]  Pinkes could have reasonably inferred from that limited amount of available information that (1) none of the three owned the vehicle, and (2) it had been entrusted to Mohammed by its owner.  It was therefore also reasonable to infer that, at a minimum, Mohammed had common authority over the vehicle.  Mohammed consented to the search of the automobile ("Look all you want"), and there is no evidence that any other occupant objected to that search.

The Court next turns to the issue of whether Mohammed's consent to the search of the automobile applied to the search of the closed briefcase in the trunk of that automobile.

C.      **The Search of the Briefcase**

As a general proposition, a consent to search a particular property (such as an apartment or an automobile) does not extend automatically to all closed containers (such as briefcases, purses, and duffel bags) situated within that property.   Rather, it must be "'objectively reasonable' under the circumstances for a police officer to believe that the scope of a suspect's consent permitted the officer to open a particular container within [the property]." *United States v. Infante-Ruiz*, 13 F.3d 498, 502 (1st Cir. 1994) (quoting *Jimeno*, 500 U.S. at 249).[7]

_____

[6] The Court acknowledges the possibility that Pinkes at some point confused Mohammed with Wilson (who was the boyfriend of Adu) or that he misunderstood Mohammed's description of Adu (she was a friend who was female, although not his girlfriend in a romantic sense).

[7] Generally, in order to uphold a consensual search, the government must show that the search did not exceed the scope of the consent given.  *See United States v. Turner*, 169 F.3d 84, 87 (1st Cir. 1999).  The standard is that of "objective reasonableness: 'what would the typical reasonable person have understood by the exchange between the officer and the subject?'"  *United States v. Melendez*, 301 F.3d 27, 32 (1st Cir. 2002) (quoting *Jimeno*, 500 U.S. at 251).  The scope is generally defined by the expressed object of the search. *Jimeno*, 500 U.S. at 251. Here, there was no expressed object of the search; it appears to have been a generalized search for evidence of possible wrongdoing.

Whether such container searches are objectively reasonable depends on fact-specific determinations in particular cases, with few bright-line rules.  *Compare*, *e.g.*, *Jimeno*, 500 U.S. at 251 (objectively reasonable for officer to conclude that consent to search automobile for drugs included consent to search folded brown paper bag on floorboard that might contain drugs) *and Matlock*, 415 U.S. at 177 (search of diaper bag in bedroom closet permissible based on general consent to search apartment for money and gun) *with Infante-Ruiz*, 13 F.3d at 505 (not objectively reasonable for officer to conclude that consent to search of automobile included consent to search unlocked briefcase in trunk that had been identified as belonging to another person) *and United States v. Welch*, 4 F.3d 761, 764 (9th Cir. 1993) (not objectively reasonable for officer to conclude that consent to search automobile by male occupant included consent to search purse in trunk where there was no evidence of joint access to or shared control over the purse).

However, regardless of whether Mohammed *intended* to let Pinkes search the briefcase, his consent is valid only to the extent he had the *authority*—either actual or implied—to consent to such a search.[8]  *Rodriguez*, 497 U.S. at 188-89.  Thus, before determining the scope of Mohammed's consent, the Court must first decide the predicate question of whether Mohammed had authority to consent to the briefcase search at all.

Mohammed plainly did not have actual authority to consent to the search of the briefcase. There is no dispute that the briefcase and its contents belonged to Botchway.  There is no

---

[8] Defendant relies heavily on *Infante-Ruiz* in arguing that the *scope* of Mohammed's consent did not extend to the trunk or briefcase.  Although the reasoning of the case is instructive, it is not directly relevant to the issue of *authority* to consent to a search of the briefcase.  Were the Court to find that Mohammed possessed such authority, the next step in the analysis would be to determine whether the scope of his consent could reasonably be understood to include the briefcase.

evidence that Botchway shared access or control over the briefcase with any other person.  He did

not abandon the briefcase, entrust it to another, or otherwise relinquish authority over it in any

respect.  *Cf. Infante-Ruiz,* 13 F.3d at 504.  Furthermore, "[f]ew places outside one's home justify

a greater expectation of privacy than does the briefcase."  *United States v. Freire*, 710 F.2d 1515,

1519 (11th Cir. 1983).  Indeed, the government does not argue such actual authority existed.

Thus, the search is valid only if Mohammed had apparent authority; that is, if the facts

available to Pinkes at the time of the search were sufficient to "warrant a man of reasonable

caution in the belief that [Mohammed] had authority" over the briefcase.  *Rodriguez*, 497 U.S. at

188 (internal quotation marks omitted).  The facts here do not warrant such a conclusion.

Pinkes did not ask, and was not told, to whom the briefcase belonged.  Instead, the

trooper simply inferred—based *solely* on the physical location of the briefcase in the trunk—that

Mohammed had authority over its contents, notwithstanding the fact that the briefcase bore no

identification and the car contained two other passengers.[9]

That inference does not appear, on these facts, to have been reasonable.  The police

cannot reasonably infer that every container within a motor vehicle is under the shared authority

of its owner or operator, regardless of the nature of the container or the presence of other

passengers.  At the point that Pinkes picked up the briefcase and unzipped it, he had no

reasonable basis for concluding that it belonged to Mohammed; at most, Pinkes might have

reasonably concluded that there was a one-in-three chance that it belonged to any particular

---

[9] Pinkes did not ask Mohammed whether the briefcase was his, nor did he make any other inquiry; instead, he proceeded to open it.  It became immediately apparent that the briefcase belonged to Botchway; Pinkes then called Botchway to come over and asked him if the contents of the briefcase were his.  When Botchway responded in the affirmative, Pinkes did not ask for his consent, but simply continued the search.

occupant of the automobile.  Those odds are not sufficient to warrant an officer "of reasonable caution" to conclude that Mohammed had authority over the briefcase.

Put another way, the government's position is based on a theory of assumption of risk:  it argues that Botchway, by bringing a briefcase into the car, assumed the risk that the operator might consent to a law enforcement search.  But Mohammed's authority to consent to the search of the briefcase is necessarily co-extensive with his own authority (actual or apparent) over the briefcase; in other words, if it were reasonable to infer that he had authority to consent to its search by the police, it would, *a fortiori*, be reasonable for Mohammed himself to rummage through it.  Thus, according to the government's position, any person entering an automobile with an unmarked briefcase (or, for that matter, a purse or backpack) is deemed automatically to assume the risk of a search of that briefcase (or purse or backpack) by the owner or operator of the vehicle, or any other person to whom the owner or operator grants permission.[10]

Such a rule may provide a bright-line for law enforcement, but it appears to be far beyond the limits of legitimate societal expectations of privacy.  The touchstone of any analysis under the Fourth Amendment is "reasonableness."  *Jimeno*, 500 U.S. at 250.  It seems clearly unreasonable and at odds with both "widely shared social expectations," *Randolph*, 126 S. Ct. at 1521, and legitimate expectations of privacy, *Rakas v. Illinois*, 439 U.S. 128, 143 & n.12 (1978), to conclude that vehicle operators have such sweeping authority over the belongings of their passengers.

---

[10] For these purposes, there is no meaningful distinction to be drawn between carrying the briefcase into the passenger compartment and placing it in the trunk.  The trunk is not a trash bin or a publicly-accessible place. *See Infante-Ruiz*, 13 F.3d at 501 ("Storing items inside a closed briefcase inside a locked car trunk did not reveal a willingness on the part if [its owner] to 'expose' such items to the public.").

13

Finally, the Court's conclusion is reinforced by two other factors that bear on the reasonableness inquiry. First, the burden on law enforcement to identify ownership of the briefcase, or to seek consent to search, was very slight; a simple question would have sufficed. *See Infante-Ruiz*, 13 F.3d at 505. Indeed, the trooper specifically asked Botchway whether the briefcase was his—but only after he had begun to search it. Second, a contrary conclusion would create a perverse result: the police would be in a better position if they made no inquiry at all as to briefcases, purses, and luggage, but simply went ahead and searched everything in the car.[11]

* * *

Put simply, it was not objectively reasonable for Trooper Pinkes to believe that Mohammed had authority over the briefcase. The search of the briefcase was therefore unreasonable, and its contents must be suppressed. The review by Pinkes of the contents of the briefcase, in turn, led him to seize the computers and equipment from the car, and led directly both to Botchway's statements at the traffic stop and during ICE questioning the next day. Accordingly, the motion to suppress must also be granted as to the computers and equipment and to statements made by Botchway on July 13 and 14 concerning his ownership and use of the equipment to make false identification items.

## III.    Conclusion

The Court takes no pleasure in granting a motion to suppress, which in all likelihood will

---

[11] Had Mohammed been driving the car alone, it might well have been reasonable for the trooper to have concluded that he had apparent authority to consent to a search of the briefcase. The Court would then face the question of whether Mohammed's directive to "Look all you want" extended to the briefcase inside the trunk. *Cf. Infante-Ruiz*, 13 F.3d at 504-05. Those facts, however, are quite different from those of the case at hand.

lead to the dismissal of the criminal charges for lack of evidence.  The Court is also cognizant of the fact that law enforcement officers in the field are often required to make quick decisions that are all too easy to second-guess from the comfort of judicial chambers.  Nonetheless, when an officer has crossed the boundary between a reasonable and an unreasonable search, the Court must adhere to the requirements of the law.

Defendant's Motion to Suppress is accordingly GRANTED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
United States District Judge

Dated: June 8, 2006